Argued and submitted September 2, affirmed December 22, 1987

In the Matter of the Marriage of

HRUBY,
*Petitioner,*
*and*

HRUBY,
*Respondent.*

FRANK,
*Petitioner on Review,*

*v.*

HRUBY,
*Respondent on Review.*

(TC D8111-68418; CA A38815; SC S33934)

748 P2d 57

Elizabeth Welch, Portland, argued the cause for petitioner on review. With her on the petition were Robin E. Pope and Welch and Koch, Portland.

Brad Benziger, Portland, argued the cause for respondent on review. With him on the response brief was Benziger & Karmel, Portland.

LENT, J.

## LENT, J.

ORS 109.119 allows "[a]ny person * * * who has established emotional ties creating a child-parent relationship with a child" to intervene in, or to initiate, proceedings to determine child custody and related matters. The issue is whether natural parents have rights to the custody of their children that are superior to the custodial rights, if any, of persons satisfying the requirements of ORS 109.119 and, in particular, whether ORS 109.119 itself grants persons satisfying its requirements substantive custodial rights.[1] We hold that ORS 109.119 does not grant substantive custodial rights and that a court must give custody of children to their natural parents unless there are compelling reasons for giving custody to another party.

In a marriage dissolution proceeding between the father and mother of the child whose custody is at issue in this case, the circuit court had "decreed" that the father was to have custody of the infant child subject to right of visitation by the mother. The mother had stipulated to that "decree." The mother does not now seek custody of the child and is not a party to the present proceeding.

About three and one-half years after the "decree," the father's sister (the child's aunt), who had had physical custody of the child by agreement of the father and the aunt since the time of "decree," intervened in the dissolution proceeding pursuant to ORS 109.119. Following a hearing, the circuit court, which did not find either the aunt or the father unfit to care for the child, gave custody of the child to the father, stating that a primary reason for the decision was that of natural parentage. The Court of Appeals affirmed. *Hruby and Hruby,* 84 Or App 448, 734 P2d 378 (1987). Because the record in this case does not reflect any compelling reason for denying custody of the child to the father, we affirm the decision of the Court of Appeals and the judgment of the circuit court.

### I.

The child was born in July 1981 in Bremerton, Washington, where the father was stationed while serving in the

---

[1] By "natural parent" we mean a parent in the biological sense. Much of what is said in this opinion with respect to natural parents may apply equally to adoptive parents. *See* ORS 109.041; ORS 109.050.

United States Navy. Two months after the child's birth, the father and the mother separated. Because neither parent was then able to care for the child, the father placed the child with his sister, the intervenor in this proceeding, who lived in Portland with her husband and two teenage daughters.

The father initiated this dissolution proceeding soon after the separation, and, in 1982, the circuit court "decreed" the marriage dissolved and gave custody of the child to him. Nevertheless, the aunt continued to care for the child in her home because the father remained in the Navy, stationed in Bremerton, Portland and, finally, San Diego, California. The father, however, visited the child frequently and regularly paid the aunt for the child's support. As the child grew older, the child developed an emotional attachment to him and came to recognize him as its father, although the child had also developed a child-parent relationship with the aunt and uncle. The mother, in contrast, ceased to visit the child or to have any other significant contact with the child soon after the "decree" of dissolution. The child does not now know her to be its mother.

In June 1985, the father remarried and sought to regain physical custody of the child from the aunt, but she was reluctant to transfer the child to him. The father, with police assistance, then took the child to his home in San Diego, where he lived with his wife, their infant daughter and the wife's son from a former relationship. The aunt soon thereafter intervened in the original dissolution proceeding pursuant to ORS 109.119, obtained a court order for temporary custody of the child and regained the child's physical custody several weeks later.

At a two-day hearing before a reference judge in November 1985, the father and the aunt presented a great volume of testimony, both expert and lay, concerning their abilities to care for the child and the strength of their relationships with the child.[2] The reference judge concluded that

---

[2] The parties to a civil action may request that the action be referred to a reference judge. ORS 3.305(1). The reference judge presides over the trial of the action and eventually issues a final written report containing the judge's findings of fact, conclusions of law, and judgment. ORS 3.315. Upon receipt of the report, the presiding judge of the circuit court is required to enter the judgment contained in the report as the judgment of the circuit court. ORS 3.315(6).

both the father and the aunt had developed close relationships with the child and that both were capable of properly caring for the child. The judge did express some concern for the then four-year-old child's ability to adjust to a move from the only home the child had known since infancy, but he nonetheless gave custody to the father, explaining the decision as follows:

> "It still boils down to this, that that is dad, that will always be dad, he has a right to the custody of his child. But * * * there are some legitimate concerns about the best interests of the child at the present time. And my order is going to be this, * * *, that [the child will] remain where [the child] is at the present time [with the aunt], but with the order of the Court * * * that within the next 10-month period of time, that [the child] be assimilated back in the home of the father through appropriate visitations, through appropriate time placements so that when all is said and done, [the child] has a continuing relationship with [the aunt and uncle, whom the child] knows as mom and uncle or dad."

The reference judge stayed the transfer of custody to the father pending appeal.

On appeal, the aunt argued that the reference judge had erred in according a custodial preference to the natural parent rather than basing his decision solely on "the best interests of the child." Limiting consideration to "the best interests of the child" was said by her to be required both by case law and by ORS 109.119, which the aunt argued eliminated any custodial preference in favor of natural parents over an intervenor or petitioner who had satisfied the requirements of ORS 109.119.

The Court of Appeals rejected these arguments and affirmed the judgment of the circuit court:

> "[ORS 109.119] merely allows a third party non-parent to initiate or appear in a proceeding to determine custody. ORS 109.119(3) and (4) relate to establishing the petitioner's right to petition or intervene. Once that has been established, the court must then decide the custody issue in the best interests of the child and may give preference to a natural parent over an intervenor.

> "The trial court heard considerable evidence from the parties, from lay witnesses and from expert witnesses. It concluded that father should have custody and gave considerable

weight to the biological fact of parentage. We agree with that decision."

84 Or App at 450-51. We allowed the aunt's petition for review.

Before discussing the effect of the legislature's enactment of ORS 109.119 on child custody disputes between natural parents and intervenors or petitioners under that statute, we first review this court's prior decisions regarding the standard to be applied in deciding child custody disputes between natural parents and other persons.

## II.

■ When Oregon's provisional, territorial and state governments adopted "the principles of common law and equity" in the mid-nineteenth century, *see Norwest v. Presbyterian Intercommunity Hosp.,* 293 Or 543, 547 n 4, 652 P2d 318 (1982); Or Const, Art XVIII, § 7, the "principle" governing child custody determinations was:

"[A] father has the paramount right to the care and custody of his minor children, unless it be shown that he is a man of grossly immoral principles or habits, or that he has not the ability to provide for them, or that they have been ill-used by him."

*Jackson v. Jackson,* 8 Or 402, 403 (1880); *see also* 2 Kent, Commentaries on American Law *205 (10th ed 1860). Soon after statehood, Oregon by statute extended this custodial right of fathers to mothers as well, thereby creating a parental custodial right.[3] Or Laws 1880, p 7, § 2 (now codified in

---

[3] Apart from the implicit recognition in this and other Oregon statutes (*see, e.g.,* ORS 419.472 to 419.600 (juvenile court proceedings)) of a natural parent's common-law right to the custody of his (and now her) children, natural parents have custodial rights under the Fourteenth Amendment to the United States Constitution. *Santosky v. Kramer,* 455 US 745, 753, 102 S Ct 1388, 71 L Ed 2d 599 (1982) (and cases cited therein); *see also State v. McMaster,* 259 Or 291, 295-96, 486 P2d 567 (1971); *State v. Jamison,* 251 Or 114, 117, 444 P2d 15 (1968). Natural parents may also have custodial rights unenumerated in the Oregon Constitution. *See* Or Const, Art I, § 33 ("This enumeration of rights, and privileges shall not be construed to impair or deny others retained by the people."). The extent to which other persons, such as those satisfying the requirements of ORS 109.119, have constitutional rights in the custody of children is unclear. *See, e.g., Smith v. Organization of Foster Families,* 431 US 816, 842-47, 97 S Ct 2094, 53 L Ed 2d 14 (1977). Also unclear are the circumstances under which a state can constitutionally give persons other than natural parents custodial rights equivalent to those of natural parents. The parties, apart from a brief citation in the father's brief, have not raised these issues, and our resolution of the case makes it unnecessary for us to discuss them further.

slightly reworded form as ORS 109.030); *see also Jackson v. Jackson, supra;* General Laws of Oregon, ch 5, § 497(1), pp 271-72 (Civ Code 1862) (Deady 1845-64).

The common-law right of a father to the custody of his children is of ancient origin and can be traced back to Roman law and beyond, whereas the qualifications upon that right, such as those noted in the quote above, arose more recently out of the decisions of eighteenth and early nineteenth century equity courts. *See* McGough & Shindell, *Coming of Age: The Best Interests of the Child Standard in Parent-Third Party Custody Disputes,* 27 Emory L J 209, 217-21 (1978). The equity courts justified the development and application of these qualifications as an exercise of the *"parens patriae* power" of the sovereign to look after the interests of minors and others unable to care for themselves. *Id.;* Rossman, *Parens Patriae,* 4 Or L Rev 233, 236 (1925). Courts and commentators in both England and the United States usually were careful to stress that the custodial right of a father was nothing so crass as a property right, and nothing so absolute as the Roman *patria potestas,* but was analogous to the right of a trustee, with children as the *res* of the trust. *See* 2 Kent, *supra,* at *203; Rossman, *supra,* at 236.

█  ˙  In child custody disputes between natural parents and other private parties, this court early resolved the tension between the custodial rights of natural parents and the *parens patriae* power of the state by applying some variant formulation of the rule that a natural parent was entitled to the custody of his or her children unless that parent was unfit or unable to care for the children properly; absent such a threat to the children's welfare, their interests, much less the interests of nonparents seeking their custody, were of no concern.[4] Thus, in *Jackson v. Jackson, supra,* the first Oregon appellate case involving a custody dispute between a natural parent and a nonparent, this court gave custody of a child to the child's father over the child's maternal grandfather, stating that "the father * * * certainly has the better right to its care and custody, unless he is manifestly an improper person to take

---

[4] *Cf.* ORS 419.476(1) (definition of children within jurisdiction of juvenile court); Lord's Oregon Laws § 4406 (1910) (definitions of "dependent" and "delinquent" children within jurisdiction of juvenile court); Or Laws 1889, p 39-40 (conferring on certain charitable organizations custodial powers over "homeless, neglected or abused" children).

charge of it, which does not appear to be so in this case." 8 Or at 404. In another early case, *Ex parte Barnes,* 54 Or 548, 104 P 296 (1909), the court gave custody of a two-year-old child to the child's father, even though the child had always lived with the child's maternal grandmother. The court summarized the reasons for its decision as follows:

> "[T]he law recognizes the father, the mother being dead, as the rightful custodian of his child, as against the claim of all persons. Of course, the court in the interest of the child may take it from the parents and make other provisions for it, but there must be some good cause for so doing. No doubt the [maternal grandmother] would give the child a good home and the best of care, and is very much attached to it, but as against the father she has no legal claim upon it. * * * If the father were unworthy or incapable of caring for it properly, then it would be the duty of the court to place it elsewhere, but no plea of that character is made here. The divorce suit [which gave custody of the child to its mother, now dead] has not relieved [the father] of his parental obligation to his son, and he has done no act that forfeits his right to its custody."

54 Or at 550. Essentially the same parental fitness rule was applied in subsequent decisions of this court. *See, e.g., Fisher v. Fisher,* 133 Or 318, 320, 289 P 1062 (1930) ("As against third persons the natural rights of the parents prevail, unless it is clearly shown that the welfare of the child demands that it be taken from them."); *Gheen v. Gheen,* 247 Or 16, 18, 426 P2d 876 (1967) ("It is the general rule that unless incompetent or unfit, a parent will be preferred to the grandparent.").

It is probably not correct, however, to say that the issue in these custody disputes is any longer solely one of parental fitness. This can be seen by comparing *Ashbaugh v. McKinney,* 182 Or 652, 189 P2d 583 (1948), arguably the most extreme application of the parental fitness rule, with the subsequent decision of this court in *Langenberg v. Steen,* 213 Or 150, 322 P2d 1087 (1958). *Ashbaugh* involved a custody dispute between a father and a maternal aunt. The aunt had raised the 13-year-old child from birth; the father had "kept in touch" with the child and had paid some money for the child's support, but he had served in the Navy for much of the child's life and was apparently, for the most part, a stranger to the child. Nonetheless, the court gave custody to the father because there had been no showing by the aunt that he was "an unfit person to have custody of his son." 182 Or at 659.

In *Langenberg,* a mother and a nonrelative disputed the custody of a 15-year-old child whom the nonrelative had raised from the age of two months. This court reversed the circuit court and gave custody of the child to the nonrelative. After stating that in child custody cases "the polar [sic] star principle guiding the court * * * is the best interests and welfare of the child," the court summed up the reasons for its decision:

> "Such consideration of the entire record in this proceeding leads this court to conclude that the welfare and interests of this child will be best served by retaining the custody of the child with the [nonrelative]. It is most heavily weighted by the fact that the only home ever known by this child has been in the home of the defendant. The evidence clearly reflects that she has there received every care and attention that a natural mother could bestow. To change the home and method of life of a girl now 15 years old under the circumstances disclosed by the evidence of this case would be *highly detrimental* to the best interests and welfare of the child." (Emphasis added.)

213 Or at 152.

Upon a superficial reading, *Langenberg* could be read to eliminate the custodial right of natural parents. Nowhere in *Langenberg* is there any mention of a custodial right of the natural mother, and nowhere is there any explicit statement that she was "unfit" to care for the child. But such a broad reading would be unwarranted. The opinion does not purport to overrule prior decisions, and the subsequent case of *Gheen v. Gheen, supra,* repeated the rule that "the natural right of the parent to the care and custody of minor children should not, except for most cogent reasons, be denied in favor of third persons." *Gheen,* 247 Or at 19. Rather, *Langenberg* is best understood as holding that, even if a natural parent is willing and able to care for a child, *i.e.,* "fit," a court should not give custody to that parent if giving custody to that parent would be "highly detrimental" to the child's welfare, regardless of the parent's fitness. So understood, the holding is consistent with earlier and later decisions holding that custody should be given to natural parents absent "good cause" or "cogent reasons" for placing the child elsewhere.[5]

---

[5] The Oregon law with respect to parent-nonparent custody disputes is perhaps best summarized in the dissenting opinion of Justice O'Connell in *Parmele v.*

*Langenberg* does, however, highlight the confusion caused by this court's sometimes perfunctory incantations in all manner of child custody cases that the primary considerations before the court in deciding custody are "the best interests of the child." These incantations have masked the different interests of children that are operative in different types of custody disputes.

■ In custody disputes between natural parents and others, the interests of children that are operative are those with which a court is concerned in its role as *parens patriae.* That is, courts will deprive natural parents of the custody of their children only in order to protect the children from some compelling threat to their present or future well-being. Apart from these concerns, it is irrelevant to the court's custody determination that the children might have a better home or might have greater financial, educational or social opportunities in the custody of another. *See In re Schein,* 156 Or 661, 667-68, 69 P2d 293 (1937); *In re Guardianship of Baldwin,* 130 Or 206, 208-09, 278 P 1078 (1929). Thus, when the court in these cases

---

*Mathews,* 233 Or 616, 626, 379 P2d 868 (1963) (dissenting from the court's holding that it lacked jurisdiction to decide the issue and not from a holding regarding the substantive law to be applied):

> "The choice [of custody] would clearly favor the [nonparent's] custodianship if we were permitted to consider only the best interest of the child in these contests between the parent and a third person. The boys' chance for happiness and spiritual fulfillment would appear to be greater if they were permitted to remain in the home of the [nonparent]. But the best interest of the child is not the sole test for allocating custody in this class of cases. The interest of the parent must also be considered. A fit parent has the right to the custody of his minor children *unless there are compelling reasons for depriving him of that custody.* The parental right is not absolute. Under some circumstances it may be necessary in the interest of the child's welfare to deprive a fit parent of his custodial right. It is possible that in some circumstances the uprooting of a child from his surroundings would be so inimical to his well-being that the parental claim to custody would have to be denied.[7] [Emphasis added.]
>
> "* * * * *

---

"[7.] See Langenberg v. Steen, 213 Or 150, 322 P2d 1087 (1958)."

233 Or at 636.

At least two decisions of the Court of Appeals have followed essentially this analysis. *State ex rel Juv. Dept. v. G.W.,* 27 Or App 547, 556 P2d 993 (1976); *Reflow v. Reflow,* 24 Or App 365, 545 P2d 894 (1976). *But cf. Yost v. Phillips,* 21 Or App 464, 468, 535 P2d 94 (1975) (apparently applying the more limited parental fitness rule). *Reflow* was cited favorably by the proponents of ORS 109.119. *See* Minutes, House Judiciary Committee, Subcommittee No. 1, April 29, 1985, exhibit F.

makes statements such as "the guiding star for the court is the welfare of the minor child," *Fisher v. Fisher, supra,* 133 Or at 320, the court means only that the custodial right of a natural parent is not superior to a minimum level of welfare for children, which the courts will protect as *parens patriae.*

On the other hand, in custody disputes between natural parents or between persons unrelated to the children, the interests of the children are more nearly the exclusive determinants of the custody decision. This is because the competing custodial rights tend to cancel each other, leaving only the interests of the children as relevant considerations. *See Simons et ux v. Smith,* 229 Or 277, 280-81, 366 P2d 875 (1961). For example, apart from their *parens patriae* powers, courts may also determine child custody as an adjunct to their power to dissolve marriages. ORS 107.105(1)(a). Because neither parent has a greater claim to custody than the other, this court has attempted, from its first child custody decision in a marriage dissolution action, to place children in the custody that will maximize their welfare. *See Pittman v. Pittman,* 3 Or 553, 555 (1870) ("The law confers upon the court which pronounces the decree of divorce, the power to make such order for the care and custody of the infants, as shall best suit their circumstances and best subserve their interests."); *cf.* ORS 107.137 (in marriage dissolution actions courts "shall give primary consideration to the best interests and welfare of the child").

■ We conclude from the foregoing that under the "principles of common law and equity," as further developed by legislation and the decisions of this court, a natural parent has the right to the custody of his or her children, absent a compelling reason for placing the children in the custody of another; the "best interests of the child" standard applicable to custody disputes between natural parents in a marriage dissolution proceeding is not applicable to custody disputes between natural parents and other persons. We do not use the adjective "compelling" in an effort to provide more precision to our holding through the use of that word in other contexts. We might have as easily used words such as "good cause," *Ex parte Barnes, supra,* 54 Or at 550, or "most cogent," *Gheen v. Gheen, supra,* 247 Or at 19. Because of the variety of circumstances in which custody disputes arise, any standard for determining

custody will of necessity be somewhat vague. We use "compelling" to emphasize that in a custody dispute between a natural parent and some other person, a court should not be concerned with attempting to maximize a child's welfare, but with determining whether the child will receive adequate care and love from its natural parent and whether the child will be otherwise unduly harmed, physically or psychologically, by giving custody to the natural parent.

We now turn to a discussion of the aunt's assertion that ORS 109.119 grants persons who satisfy the requirements of that statute custodial rights equivalent to those of a natural parent.

## III.

ORS 109.119 was enacted in 1985 and amended in 1987. Or Laws 1985, ch 516, § 2; Or Laws 1987, ch 810, § 1. Because the 1987 amendments did not take effect until after this case was on appeal, they do not drive our decision.[6] As enacted in 1985, ORS 109.119 provided in relevant part:

> "(1) Any person including but not limited to a foster parent, stepparent, grandparent or relative by blood or marriage who has established emotional ties creating a child-parent relationship with a child may petition or file a motion for intervention with the court having jurisdiction over the custody, placement or guardianship of that child, or if no such proceedings are pending, may petition the circuit court for the county in which the minor child resides for an order providing for custody or placement of the child or visitation rights or other generally recognized rights of a parent or person in loco parentis. This subsection does not grant any right to petition or file a motion for intervention in any proceeding involving the dissolution of marriage.[7]
>
> "* * * * *
>
> "(3) A motion for intervention may be denied or a petition may be dismissed on the motion of any party or on the

---

[6] The portion of the 1987 amendment relevant to the issue presented by this case is discussed in note 9, *infra*.

[7] The father has not challenged the aunt's intervention in this marriage dissolution proceeding, although the last sentence of subsection (1) would appear to make her intervention permissive rather than as of right. In any case, this sentence was eliminated by the 1987 amendment of ORS 109.119. Note, also, the discussion at the outset of this opinion concerning the timing of intervention in this case.

court's own motion if the petition does not state a prima facie case of emotional ties creating a child-parent relationship or does not allege facts that the intervention is in the best interests of the child.

"(4) A petitioner establishes a prima facie case of a child-parent relationship if the petitioner shows that the petitioner has maintained a child-parent relationship with the child with substantial continuity for two or more years.

"(5) As used in this section, 'child-parent relationship' means a relationship that continues on a day-to-day basis, through interaction, companionship, interplay and mutuality, that fulfills the child's psychological needs for a parent as well as the child's physical needs."

It is undisputed that the aunt has established the existence of a "child-parent relationship," as defined in ORS 109.119(5), between herself and the child. This was the basis upon which she intervened in the dissolution proceeding, and the father does not challenge that intervention. The question is whether, as the aunt contends, ORS 109.119 also grants persons who have established a child-parent relationship custodial rights equal to those of a natural parent.

It is apparent from reading ORS 109.119 that it does not explicitly confer any substantive custodial rights. The only right that it confers is the right to petition or to intervene. Nonetheless, the aunt asserts that the legislature intended to confer such rights in enacting ORS 109.119 and that otherwise the statute would be a "hollow shell." Our examination of the legislative history of the enactment of ORS 109.119 does not bear out these assertions. The legislature did not intend to alter substantive custodial rights and did not believe that it was enacting a "hollow shell" in granting persons who had established a child-parent relationship with a child the right to be heard on matters related to that child's custody.

House Bill 2460 was the impetus for ORS 109.119, enacted by the 1985 legislature. The bill was sponsored by the House Judiciary Committee at the request of the Committee for Oregon Families, a private organization. Testimony before the Judiciary Committee by members of the Committee for Oregon Families and others reflects that the problem to be addressed by the bill was the perceived inability of nonparents to be heard in court on matters related to the custody of

children for whom they had long cared. Although the testimony did not cite any Oregon statutes or appellate decisions that would have denied standing to long-term nonparent caretakers, several witnesses testified that they had been denied standing by trial courts or had been told by attorneys that they lacked standing. Minutes, House Judiciary Committee, Subcommittee No. 1, April 29, 1985, pp 12-16 & exhibits F-L. HB 2460 addressed this problem by giving persons who met the requirements set forth in the bill the right to intervene in, or to initiate, proceedings to determine child custody and related matters. Mr. Phillips, Secretary to the Committee for Oregon Families, testified: "The step proposed by [HB] 2460 is that all persons who have legitimately formed a parent/child relationship with a minor should be given standing to present their case and all relevant information in court whenever questions of custody, visitation or adoption are at issue." Minutes, *supra,* April 29, 1985, exhibit G, p 1.

Although HB 2460 conferred standing on certain adults, members of the Committee for Oregon Families testified that the purpose of the bill was to further the interests of the children involved by allowing courts to be more fully informed about those interests through the participation of persons who had established parental bonds with the children. Minutes, *supra,* April 29, 1985, pp 13-14 & exhibits F-G; Minutes, Senate Judiciary Committee, June 14, 1985, p 35. Witnesses stressed that a child's interests were often best served by continuing custody in nonparents with whom the child had established an emotional bond rather than in transferring custody to a natural parent, even in instances where the natural parent would well care for the child. Ms. Julie McFarlane, a member of the Committee for Oregon Families, testified that it was important that persons who have become attached to children have standing in custody determinations because "[t]he importance of stability and continuity provided by an unchanging family environment is well established in psychological as well as legal literature." Minutes, House Judiciary Committee, Subcommittee No. 1, April 29, 1985, exhibit F, p 2.[8]

---

[8] Goldstein, Freud & Solnit, Beyond the Best Interests of the Child (1973) popularized the argument that maintaining relationships with "psychological parents" was important to the emotional well-being of children. The work apparently had some influence on the drafting of ORS 109.119; the definition of "child-parent relationship" in ORS 109.119(5) is taken verbatim from the definition of "psychological parent" in the model child placement statute proposed by the authors.

This focus on the interests of children, as well as numerous statements in committee hearings that the governing standard for custody determinations was the "best interests" of the children involved, *see, e.g.,* Minutes, House Judiciary Committee, April 29, 1985, pp 13-14 & exhibit G, p 4, might be some evidence that the legislature intended that custody disputes between natural parents and "ORS 109.119 parents" be decided solely on the basis of the interests of the children. But the evidence to the contrary, that the bill was not intended to alter substantive custodial rights, is overwhelming.

In its original form, as drafted by legislative counsel, HB 2460 read as follows:

"Section 1: (1) Unless the court having jurisdiction over the custody or placement of a child determines that any of the following is not in the best interests of the child, upon petition, the court shall give preference to persons described in paragraphs (a) to (d) of this subsection over persons not in a child-parent relationship in custody, placement, visitation rights or other generally recognized rights of a parent or person in loco parentis:

"(a) A foster parent.

"(b) A stepparent.

"(c) A relative by blood or marriage.

"(d) Any other person who has established a parental relationship with the child.

"(2) In making the determination required under subsection (1) of this section, the court shall be guided by the need of the child for a continuing, stable child-parent relationship *without placing undue emphasis on a blood relationship in which the child-parent relationship is insubstantial or nonexistent.*

"(3) A petition described in subsection (1) of this section establishes a prima facie case of a child-parent relationship if the petitioner shows that the petitioner has maintained a child-parent relationship with the child with substantial continuity for two or more years." (Emphasis added.)

At the first hearing on the bill, the Committee for Oregon Families disavowed this version and substituted an amended version, which in substantial part eventually became subsection (1) of ORS 109.119. Minutes, House Judiciary

Committee, Subcommittee No. 1, April 29, 1985, p 12. The stated reason for rejecting the legislative counsel's draft was that it went "one giant step beyond standing and addressed the issue of preference in custody." *Id.* (testimony of Ms. McFarlane). Mr. Phillips, the Secretary to the Committee for Oregon Families, testified that the amended bill was intended to allow the trial court to "hear everyone" and to "know all the facts"; it was not intended to go beyond that "to make suggestions to the court" regarding what to do with that evidence. *Id.* at 12-13. In particular, Mr. Phillips testified that the bill was not intended to modify the rule that "a fit parent has the right to the custody of minor children unless there are compelling reasons for depriving him/her of that custody." *Id.*

In a letter to the Senate Judiciary Committee, the Committee for Oregon Families stated:

> "*The remedy* [provided by HB 2460] *is procedural, not substantive:* HB 2460 does not attempt to direct the court in any way about what it does with such evidence once it has been submitted. No change in substantive law is anticipated. This is important because the delicate balance between the rights of the natural parents and the best interests of the child is a rapidly evolving area of case law. [HB] 2460 is not intended to address these controversial issues; its only function is to make sure the court has free and ready access to all relevant information." (Emphasis in original.)

Minutes, Senate Judiciary Committee, June 7, 1985, exhibit M, p 1. In addition, Ms. Karen Pierson, Manager of the Client Services Section of the Children's Services Division (CSD), testified that the CSD would have opposed the original version of HB 2460 because it would have conflicted with the rights of legal parents under various federal laws. Minutes, House Judiciary Committee, Subcommittee No. 1, April 29, 1985, p 15 & exhibit J. No one testified or stated in any of the committee hearings on HB 2460 that it was intended or would have the effect of giving persons who established a child-parent relationship with a child equal custodial rights with natural parents.

In light of the language and history of ORS 109.119, we conclude that it did not alter the substantive law to be applied in deciding child custody disputes between natural

parents and persons who satisfy the requirements of that statute.[9]

## IV.

■ The remaining issue is whether there were compelling reasons in this case for denying custody of the child to the father. While this court may review child custody determinations anew upon the record, *see* ORS 19.125(4), in practice deference is given to the factual findings of the court that heard the evidence. *See Montgomery v. Montgomery,* 237 Or 544, 545, 392 P2d 324 (1964); *cf. State ex rel Juv. Dept. v. Jones,* 290 Or 799, 810, 626 P2d 882 (1981) (termination of parental rights).

There was no finding by the reference judge that the father was unable or unwilling to provide love and care for the child, and there is nothing in the record from which such an inference could reasonably be drawn. The only possible compelling reason contained in the record for denying the father custody of the child is the psychological harm that the child might suffer if it were to be taken from its aunt and uncle, with whom it had developed a child-parent relationship. Dr. Greg

---

[9] ORS 109.119 was amended in 1987 by HB 3197. Amendments were requested by the Committee for Oregon Families, the organization that requested the 1985 enactment of ORS 109.119. In testimony before a House Judiciary subcommittee, Ms. Sherman, a member of the Committee for Oregon Families, described HB 3197 as "clean-up" legislation that expanded the proceedings subject to intervention and that permitted courts to make temporary custody awards. Minutes, House Judiciary Committee, Subcommittee No. 3, March 17, 1987, p 6 & exhibit F. HB 3197 as originally introduced, however, was amended during the legislative process to add the following sentence to ORS 109.119(1):

"If the court determines that custody, guardianship, right of visitation, or other generally recognized right of a parent or person in loco parentis, is appropriate in the case, the court shall grant such custody, guardianship, right of visitation or other right to the person having the child-parent relationship, if to do so is in the best interest of the child."

There is little mention of this amendment in the committee minutes and no mention of its effect on the custodial rights of natural parents. Although we have no occasion to decide its effect on the issue presented by this case, we note that the language used is at least in some respects wholly consistent with this court's previous decisions in child custody disputes between natural parents and others. In such disputes, it would never be proper to give custody to someone *other* than a natural parent unless custody in the other person best served the child's interests. The ambiguity of the sentence lies in whether it would allow a court to deny custody to a natural parent if custody in another would best serve the child's interests. The answer turns on whether the language "is appropriate in the case" calls for consideration of the custodial rights of natural parents.

Reiter, a clinical psychologist and witness for the aunt, testified that, although both the father and his wife and the aunt and her husband would be "appropriate parents," it "would be a mistake right at this time" to remove the child from the aunt. He recommended that any transfer of custody be made over a three or four-year period in which the child could express its feelings regarding custody. On the other hand, Dr. Richard Sardo, a clinical psychologist and witness for the father, testified that the child had strong emotional attachments to both the aunt and the father and wanted to live with both, but recommended that the father have custody because children who know their natural parents but who are not placed in the custody of those parents develop psychological conflicts as they grow older. He recommended that the transfer of custody be immediate because he believed that the hostility between the father and the aunt would preclude cooperation in a gradual transfer of custody. Thus, neither of these experts testified that giving ultimate custody of the child to the father would be significantly harmful to the child, although they did disagree on the length of time appropriate for a transfer of custody.

The reference judge, taking note of the concerns expressed over an abrupt transfer, ordered that the transfer of custody to the father take place gradually over a period of ten months and that the aunt be permitted visitations thereafter. We conclude that these orders were appropriate. If this were a case such as *Langenberg v. Steen, supra,* in which the natural parent was a virtual stranger to the child, or a case such as *Parmele v. Mathews,* 233 Or 616, 379 P2d 868 (1963), in which the children greatly disliked their natural parent and refused to live with her, we would hesitate to conclude that there was no compelling reason to deny custody to the natural parent. But this case does not present such circumstances. The child has an emotional attachment to the father and wishes to be with him (though also with the aunt). In addition, the child stayed at the father's home in San Diego for six weeks without experiencing any apparent psychological or emotional difficulties. Given these facts and the findings and conclusions of the reference judge, we conclude that there is no compelling reason to deny custody to the father. There has been no showing that the child would not receive adequate care and love from the father or that the child would be otherwise unduly

harmed, physically or psychologically, by giving custody to him.[10]

The decision of the Court of Appeals and the judgment of the circuit court are affirmed.

---

[10] The hearing in this case was held in November 1985. We intend that our decision speaks as of that time. If circumstances have changed since that time so as to merit giving custody to the aunt, she may, of course, petition for modification of the custody order.