Argued and submitted September 8, 1989, resubmitted In Banc January 10, reversed and remanded for further proceedings February 14, 1990

In the Matter of the Guardianship
and Conservatorship of
Shawn Michael Bjork, Eric Matson Bjork
and Tamara Lorae Bjork, Minors.

ORNDUFF et al,
*Appellants,*

*v.*

BJORK,
*Respondent.*

(A7691; CA A49503)

786 P2d 1284

Allyn E. Brown, Newberg, argued the cause for appellants. With him on the briefs was Brown & Tarlow, P.C., Newberg.

Gary A. Rueter, McMinnville, argued the cause for respondent. With him on the brief was Haugeberg, Rueter, Stone, Gowell & Fredricks, P.C., McMinnville.

GRABER, J.

Joseph, C. J., dissenting in part, concurring in part.

## GRABER, P. J.

Petitioners (grandparents) appeal from a judgment denying their petition to be appointed guardians of their grandchildren. Respondent is the father of the three children, who at the time of the hearing were ages 8, 10 and 12. The two older children are boys; the youngest is a girl. Grandparents filed the petition for guardianship in April, 1988, one month after their daughter, who was father's wife and the children's mother, died in a traffic accident. Grandparents' concern stems from father's sexual abuse of his daughter in the spring of 1985, when she was five years old, and from his extensive history of sexual deviancy. We review *de novo*.[1] ORS 111.105.

The abuse of his daughter occurred while father was home alone with the children. While he was sleeping, the daughter crawled into bed with him. He awakened, fondled her genitals while masturbating, and then placed her hand on his penis. The child told her mother, who in turn contacted the police. The resulting charge of sexual abuse was dismissed as part of a diversion agreement. The terms of the agreement required father to participate in a sex offender program for at least nine months and forbade unsupervised contact with his daughter. Father was in treatment from May, 1985, to June, 1986, and met the supervision condition of the diversion agreement. There is no evidence that father has had sexual contact with any of his children except for the 1985 incident with his daughter.

In October, 1986, however, father exposed himself in public to a 15-year-old girl. While driving to work, he saw the girl crossing a playground, pulled his car off the road, got out, and ran up to the girl. He stopped and began masturbating in front of her. She screamed; he grabbed her arm; she broke free and ran away. Although he denied his involvement at first, he later confessed. He pled guilty to a charge of public indecency and was sentenced to one year in jail and a $500 fine and was placed on three years' probation. He served six months of the jail sentence; the remainder was suspended. One condition of probation is that he have no unsupervised contact with females under the age of 18 and that he be treated in a sex

---

[1] Our findings on all issues would be the same, whether the standard of proof is by "clear and convincing" evidence or by a "preponderance" of the evidence.

offender program. He remains on probation presently and is again in treatment. There is no evidence that he has violated the terms of probation.

Father also has a history of other exhibitionist behavior, which appears to have started in 1983 or earlier. For example, he masturbated in his car almost daily while driving to and from work and positioned himself so as to be seen by female drivers in other cars.

Despite that history, the record shows that father has improved substantially during his current treatment, which uses accepted procedures and is well regarded by experts in the field. Father admits that he has a problem and wants to change. He testified that he now can control his sexual urges, that he no longer exposes himself, and that he intends to continue in therapy.

Father shows concern for his children. He sought counseling to help them cope with their mother's death. The children's counselor has talked with father and finds him to be a nurturing parent. Continued counseling for the children is anticipated. Father's girlfriend currently resides with him and the children in a home that he owns. She knows about father's history, including the abuse of his daughter, and about the condition that his contacts with the daughter be supervised. The girlfriend and father are considering marriage.

Just after the 1985 incident with his daughter, father moved out of the family home to the apartment of a co-worker. He spent weekends with his wife and children. In February, 1986, his wife filed for a dissolution; in June, 1986, she moved in with her boyfriend. At that time, father moved back to the family home. His sons lived with him from June, 1986, until the playground incident in October, 1986, when father again moved out. Thereafter, he lived with his girlfriend both before and after he was in jail and continued to visit with his children about every other weekend. He returned to the family home with his sons after his wife's death, which occurred shortly before the dissolution proceeding was scheduled. The daughter lived with her mother, apart from father, from the time of the abuse in 1985 until the mother's death. The daughter then lived with father's parents until about a month before the trial in this case, when she joined father and her brothers and father's girlfriend.

Five experts testified. Three said that father should not be the guardian of his children, one (father's current therapist) said that he should be, and one (the children's counselor) did not express an opinion on that question. We will discuss the experts' views more fully below.

■ In *Iremonger v. Michelson*, 97 Or App 60, 775 P2d 860 (1989), we held that ORS 126.070(2)[2] sets the standard for deciding whether the court is authorized to appoint a guardian for a child. If the court determines that a child should have a guardian and turns to the question of whom to appoint, ORS 126.035[3] grants a preference for the parents, "if qualified and suitable." We also held that *Hruby and Hruby*, 304 Or 500, 748 P2d 57 (1987), is not applicable to a statutory guardianship proceeding under ORS chapter 126. In the light of *State ex rel Juv. Dept. v. Lauffenberger*, 308 Or 159, 163-65, 777 P2d 954 (1989), we hold that the statutory preference found in ORS 126.035 requires that there be "compelling" or "cogent" reasons to grant a guardianship to a non-parent, if a parent is "qualified and suitable."[4]

■ A combination of factors convinces us that the daughter should have a guardian. The experts who testified agreed that there is a risk that father will sexually abuse her again; the question is how great that risk is. There is no "cure" for father's problem, but only means to help him learn to control it. The expert testimony was that the recidivism rate for people who complete the best sex offender programs is 10 per cent and that the risk of a repeat offense is not reduced significantly until a person has completed a well-structured treatment program and has refrained from deviant sexual behavior for three to five years. Father has not yet completed treatment, and he engaged in deviant sexual behavior less than three years before trial.

----

[2] ORS 126.070(2) provides, in relevant part:

"If the court finds that a qualified person seeks appointment, venue is proper, the required notices have been given and the welfare and best interests of the minor will be served by the requested appointment, the court shall make the appointment."

[3] ORS 126.035 provides, in relevant part:

"The parents of a minor, or either of them, if qualified and suitable, shall be preferred over all others for appointment as guardian for the minor."

[4] The trial court applied the correct legal standard.

The argument that father has not committed a repeated offense with his daughter is not persuasive in view of the fact that she did not live with him for more than three years after the abuse occurred. She had resided with him for only about a month—a period during which he knew that his behavior was under close scrutiny—by the time of trial. In other words, father had had virtually no opportunity to commit another offense against her.

The evidence is that the risk of recidivism is greater for a person who has more than one sexual abnormality and for a person who has had multiple victims. Both factors apply to father. Moreover, his first effort at treatment was not successful.

Father accosted a teenage girl, and his extensive history of exhibitionism has involved women. Those facts suggest that the daughter may face an increased risk when she reaches puberty. Three of the expert witnesses agreed that father should not be alone with his daughter, without the presence of another adult, and his probation conditions still forbid his being alone with any girl under 18. It is not realistic to expect that father can meet that condition as a full-time parent and guardian.

Finally, we note that the trial judge, who had an opportunity to observe the witnesses, found that "[father] was certainly less than candid on [sic] many instances" and that "his inability to be candid at times * * * pervades [sic] even to this time."[5] Father has not achieved the level of candor that the expert witnesses testified is needed to achieve a full recovery. Notwithstanding the strides that he is making and his desire to behave appropriately, he remains a present, substantial risk.

■ We also conclude that the sons should have a guardian. The expert testimony persuades us, on this record, that child molesters show little discrimination between boys and girls. Furthermore, the expert testimony revealed that, on the average, sex offenders display three or more deviant behaviors. The experts observed that father became increasingly "predatory" or physically aggressive as he escalated from

---

[5] Father was not completely truthful about the abuse of his daughter at his deposition or at trial on direct examination.

exposure to nonviolent abuse of his daughter to grabbing the girl in the park. Those factors lead us to agree with the experts who testified that there is a strong potential for father to commit an offense with his sons.

The testimony established that father's conduct, including his lack of complete candor, transmits harmful values to all of the children. The mother's death was, in the words of one expert witness, "devastating" to the daughter, so it is extremely important for her to live with as much of her nuclear family as possible. The sons, too, were traumatized by their mother's death. It will benefit all of the children to live together as a cohesive and stable family unit.

■       Having found that the welfare and best interests of the children will be served by the appointment of a guardian, ORS 126.070(2), we next consider who should be appointed. We find that father is not "qualified and suitable" to serve.[6] ORS 126.035. In the circumstances of this case, the same evidence leads us to both conclusions, so we will not repeat it.

Lastly, grandparents are qualified, suitable, and willing to serve as guardians for the children. ORS 126.035. We leave it to the trial court on remand to establish detailed conditions for the guardianship, which should provide for generous visitation with father and for reintegrating the children into his family unit when that becomes possible.

Reversed and remanded for further proceedings not inconsistent with this opinion.

**JOSEPH, C. J.,** dissenting in part; concurring in part.

The majority reads the statutes correctly and applies them incorrectly. ORS 126.070(2) provides the authority for a probate court to create a guardianship for a child. ORS 126.035 grants a preference to a parent "over all others for appointment as guardian." Even though ORS 126.070(2) requires the court to consider "the welfare and best interests" of the child in deciding whether there should be a guardian, the court must recognize the preference given a parent under

---

[6] Even if father were minimally "qualified and suitable," grandparents have established a compelling reason to grant their guardianship petition.

ORS 126.035, unless there be "compelling" or "cogent" reasons to avoid the preference. *State ex rel Juv. Dept. v. Lauffenberger,* 308 Or 159, 163-165, 777 P2d 954 (1988); *see Iremonger v. Michelson,* 97 Or App 67, 775 P2d 860 (1989).

In short, despite the language of ORS 126.070(2), "the best interests" of the child are not sufficient in a proceeding brought to establish a guardianship to defeat a parent's *right* to the custody of his child. As applied to this case, that means that it is not open for a probate court, or for this court on review, to deprive a parent of the *right* to custody of a child just because the court, or a majority of it, believes that the child would be better off with someone other than the parent.

The majority probably *understates* the nature and extent of father's sexual problems *in respect to young girls.* However, the record is utterly devoid of *any* evidence of *any untoward act* by father against his sons or any other male person.[1] The majority does not even pretend that there is *any* historical or present factual basis for finding him unqualified and unsuitable.

All the record contains, and all that the majority can point to, are some predictions by experts about what *might* happen in the future, because father fits to a greater or lesser extent a behavioral pattern that *might* eventuate in his sexually abusing boys, specifically, his sons. The only foundation in the opinion for the creation of a guardianship for the boys is based on that prediction. That is not fair and, as a judge sitting in equity, I do not consider it equitable. Father has had as much opportunity as any parent would ever have to demonstrate abusive conduct toward his sons. He has *never* even been accused of any such misconduct.

The majority takes a rather vindictive attitude toward father, and that is not fair, either. In a *de novo* review of the record, I prefer to look, first, to the *facts* in the record and only after that would I give weight to the opinion of experts whose opinions are based, not on facts about father, but on theories about the behavior of "average" members of a class. Even if one accepts that the psychological profiles on

---

[1] In the record there is some indication that father has never been analysed professionally with respect to males. The majority would make that count against him.

which the experts rested their opinions have predictive substance in general, I prefer to rest my judgment on the facts about father. I can find nothing in the statutes, in the case law, in the common law or in equity which would permit a court to create a guardianship and deprive a preferred parent of custody because it might "benefit all of the children to live together as a cohesive and stable family unit." 100 Or App at 454.

*State ex rel Juv. Dept. v. Lauffenberger, supra,* requires us to separate the decision about *whether* to create a guardianship from the question of whom to select as guardian. It is not so clear that the statutory framework easily permits that, but we have recognized the process in *Iremonger v. Michelson, supra.*[2]

If there is a basis in the record for creating a guardianship over the boys, I can find no "compelling" or "cogent" reason to defeat father's preference. The expert testimony about sex offenders against children as a class persuades the majority that "there is a strong potential for father to commit an offense with his sons," 100 Or App at 454, and the majority believes that the three children should remain together. *Ergo,* according to the majority, the same guardian should be appointed for the boys as for the girl. As the majority works through it, its decision to create a guardianship is, effectively, a custody decision. The preference for father receives no discussion whatsoever—except by inference. That is, the majority thinks he ought not to be the guardian of any of *his* children. The majority is correct only with respect to the girl. It is wrong with respect to the boys, and I dissent from that part of the opinion.

Richardson, Buttler and Newman, JJ., join in this opinion.

---

[2] *Lauffenberger* involved a situation where the fundamental decision was who would get custody. *Hruby and Hruby,* 304 Or 500, 748 P2d 57 (1987), also presupposed that a custody decision had to be made. In this case, the first decision is whether there ought to be a guardianship. The second question is who is to be guardian.