Argued and submitted May 3, reversed and remanded with instructions to enter judgment awarding custody to father October 18, 2002

In the Matter of the Marriage of

Rayne Elizabeth O'DONNELL-LAMONT (deceased),
*Petitioner,*

*and*

Michael David LAMONT, Jr.,
*Appellant,*

*and*

Christine O'DONNELL,
Patrick O'Donnell, and Darrell Miller,
*Respondents.*

C98 1284 DR; A112960

56 P3d 929

Philip F. Schuster, II, argued the cause for appellant. With him on the briefs was Dierking & Schuster.

Jacqueline Koch argued the cause for respondents Christine O'Donnell and Patrick O'Donnell. With her on the brief was Koch & Deering.

No appearance for respondent Darrell Miller.

Before Edmonds, Presiding Judge, and Kistler and Schuman, Judges.

EDMONDS, P. J.

**EDMONDS, P. J.**

Father appeals from a judgment that awarded custody of his two children to their maternal grandparents, the parents of father's deceased former wife.[1] We reverse.

We state the facts as we find them on our *de novo* review, in which we are assisted by the trial court's discussion in its letter opinion.[2] Father and mother were married in December 1991 and had two children, Taryn, who.was born in September 1992, and Seaira, who was born in January 1996. Early in their marriage they lived in the Detroit Lake area, near grandfather. Later, after a falling out with grandfather and his then wife, they moved to Washington County, near grandparents. Throughout the marriage, mother was the primary caregiver for the children, in part because father worked part of the time as a long-haul truck driver, which required him to be gone several nights a week.

Mother and father began having marital difficulties in 1997. In March 1998 mother obtained a Family Abuse Prevention Act restraining order against father. The basis for the order is not entirely clear from the record, and mother appears to have enforced it or ignored it as it suited her. For instance, while the order was in effect and while mother's petition to dissolve the marriage was pending, mother and father traveled together to Hawaii with the children.

---

[1] This case originally involved the dissolution of father's and mother's marriage. After mother's death, grandparents intervened in order to file their petition for custody of the children. Darrell Miller, mother's boyfriend at the time of her death, also intervened, seeking visitation rights, and is an additional respondent on appeal. The trial court did not grant Miller visitation rights, on the ground that he did not have an "ongoing personal relationship" with the children under ORS 109.119(5)(d) (1997), and he does not cross-appeal from that decision. In addition, there is evidence in the record concerning the children's paternal grandfather. In this opinion, we use the word "grandparents" to refer to the respondent grandparents and refer to Miller as "Miller." When we use the word "grandfather," we refer to the paternal grandfather.

[2] The trial court found that in his testimony father said whatever he believed would help him at the time without regard to its truthfulness. We review father's testimony with that finding in mind.

The dissolution of mother's and father's marriage became effective in September 1998. The stipulated judgment of dissolution provided that father would have supervised visitation with the children, but there is no evidence that his visitation was in fact supervised. After the dissolution, mother began a relationship with Miller. In December 1998, father came to Miller's residence while mother and the children were present. That conduct resulted in father's arrest, and he was subsequently fined for the violation of the restraining order. In March 1999, Miller, mother, and the children went to Disneyland. While they were there, mother died from a preexisting heart condition.

At the time of mother's death, father was living in a small travel trailer, which he acknowledged was inappropriate for the children. He therefore agreed that they could stay with grandparents for a time. Grandparents wanted custody of the children, but the parties were not able to agree on permanent arrangements. Father subsequently reasserted his right to custody of the children. In July 1999, grandparents filed this petition while the children were visiting with them, a visit to which father had agreed. They received an order awarding them temporary custody pending a hearing on the merits. Before the hearing occurred, the court returned custody of the children to father, who promised that he would keep them in the Salem area. Despite that promise, he moved to Montana with the children and with Laura Oliver, his domestic associate. As a result, the court found father in contempt and ordered him to return the children to Oregon; he complied with the order. Father moved to the Detroit Lake area to be near grandfather and grandfather's current wife, a retired schoolteacher. Father, Oliver, the children, and Oliver's youngest child initially lived in a large room over a garage on grandfather's property, but by the time of the hearing they had moved to a house in Mill City. In July 2000, after a hearing on the merits, the trial court awarded permanent custody to grandparents, with significant visitation for father; father appeals that award.

Before discussing the facts related to custody we must first determine the standard by which we evaluate a custody dispute between a parent and nonparents. We recently discussed that question in *Wilson and Wilson*, 184

Or App 212, 55 P3d 1106 (2002), and will summarize much of that discussion here. The issue involves the interplay between ORS 109.119 (1997)[3] and decisions of this court, the Oregon Supreme Court, and the United States Supreme Court. The relevant portions of ORS 109.119 (1997) provided:

"(1) Any person * * * who has established emotional ties creating a child-parent relationship or an ongoing personal relationship with a child, or any legal grandparent may petition or file a motion for intervention with the court having jurisdiction over the custody, placement, guardianship or wardship of that child * * *.

"(2)(a) If the court determines that a child-parent relationship exists and if the court determines by a preponderance of the evidence that custody, guardianship, right of visitation, or other generally recognized right of a parent or person in loco parentis, is appropriate in the case, the court shall grant such custody, guardianship, right of visitation or other right to the person, if to do so is in the best interest of the child. The court may determine temporary custody of the child or temporary visitation rights under this paragraph pending a final order."

Until recently, the leading case on custody and visitation disputes between a biological parent[4] and a third party was *Sleeper and Sleeper*, 328 Or 504, 982 P2d 1126 (1999).[5] In *Sleeper*, the Supreme Court focused on the best interests of

---

[3] In 2001 the legislature repealed ORS 109.121 and adopted significant amendments to ORS 109.119. Or Laws 2001, ch 873, §§ 1, 1a. The amendments to ORS 109.119 "apply to petitions filed under ORS 109.119 or 109.121 (1999 Edition) before, on or after the effective date" of the amending act, which was July 31, 2001. Or Laws 2001, ch 873, § 3, *compiled as a note after* ORS 109.119 (2001). Grandparents filed their petition before the effective date of the 1999 version of ORS 109.119. The 2001 amendments, therefore, do not apply to this case. *See Williamson v. Hunt*, 183 Or App 339, 343-44, 51 P3d 694 (2002).

[4] The Oregon cases have all involved a biological parent and a nonbiological nonparent. We do not mean by our references to that fact to suggest that the rights of an adoptive parent would be different from those of a biological parent. *See* ORS 109.350.

[5] In both *Sleeper* and the companion case of *Moore and Moore*, 328 Or 513, 982 P2d 1131 (1999), the issue arose in dissolution actions in which the husband sought custody. In each case, the husband had treated the children as his own from their births. In *Sleeper* the husband knew that he was not the children's biological father, but in *Moore* the husband learned that fact only during the course of the dissolution proceeding. Those cases, thus, probably present the most compelling circumstance for giving the nonbiological parent rights close to or identical with those of a biological parent.

the child rather than the rights of the biological parent. However, we have recently revisited the issue as a result of the United States Supreme Court's decision in *Troxel v. Granville*, 530 US 57, 120 S Ct 2054, 147 L Ed 2d 49 (2000). In that case, a majority of the justices agreed with Justice O'Connor's statement in the plurality opinion that, "[i]n light of * * * extensive precedent, it cannot now be doubted that the Due Process Clause of the Fourteenth Amendment protects the fundamental right of parents to make decisions concerning the care, custody and control of their children." 530 US at 66.[6] They also agreed that, under the circumstances of the specific case, the state trial court's decision to override the biological parent's reasonable choice to limit visitation, merely because the court believed that visitation was "in the best interest of the child," impermissibly infringed on that fundamental parental right. *Id.* at 68-70.

■ In *Harrington v. Daum*, 172 Or App 188, 18 P3d 456 (2001), and *Newton v. Thomas*, 177 Or App 670, 33 P3d 1056 (2001), we treated the biological parent's fundamental right as a supervening right that would normally trump the interests of the nonbiological parent. Thus, instead of basing custody or visitation decisions under ORS 109.119 (1997) on the "best interest of the child," subject to some undefined "supervening right" of the biological parent, we now give significant weight in that calculus to a fit biological parent's fundamental right to determine the care, custody, and control of his or her children. Thus, the fit biological parent's right is "supervening," in the sense that the right "supervenes" the pure "best interest" analysis itself, replacing it with a legal standard under which a fit biological parent will presumptively prevail over a nonparent, unless the nonparent, by a preponderance of the evidence, ORS 109.119(3)(a) (1997), can overcome the presumption.[7]

---

[6] Justice O'Connor wrote for three other justices as well as herself. In their separate concurrences, Justices Thomas and Souter acknowledged that the Court's precedents established the fundamental right that Justice O'Connor described but argued for different ways to analyze the case.

[7] That presumption, of course, is designed for the visitation context, not for a custody decision. The issue in a custody case is not whether we will uphold a parent's specific decision but whether the parent should have the authority to make such decisions in general. Depriving a fit parent of the fundamental right to determine the care, custody, and control of his or her children requires an even stronger

To determine the effect of the presumption on the process of weighing the evidence involved in disputed custody cases between biological parents and nonparents, we also take guidance from *Hruby and Hruby*, 304 Or 500, 748 P2d 57 (1987), which governed custody disputes between biological parents and qualifying nonparents before *Sleeper* and which established a standard not unlike the one that we have adopted in response to *Troxel*.[8] In *Hruby*, after a thorough review of Oregon custody cases involving parents and nonparents, the court concluded:

"[A] natural parent has the right to the custody of his or her children, [in the absence of] a compelling reason for placing the children in the custody of another; the 'best interests of the child' standard applicable to custody disputes between natural parents in a marriage dissolution proceeding is not applicable to custody disputes between natural parents and other persons."

304 Or at 510.

The court expressly noted that nonparents could establish compelling reasons to obtain custody without proving that the parent was unfit. Rather, the proper inquiry was whether custody with the parent would be " 'highly detrimental' to the child's welfare, regardless of the parent's fitness," *Hruby*, 304 Or at 508; whether custody with the nonparent was necessary "to protect the children from some compelling threat to their present or future well-being," *id.* at 509; and whether there was "good cause" or "cogent reasons," *id.* at 508, to place the child with the nonparent.

The court summarized its conclusions by explaining:

"We use 'compelling' to emphasize that in a custody dispute between a natural parent and some other person, a court should not be concerned with attempting to maximize a child's welfare, but with determining whether the child will receive adequate care and love from its natural parent and

---

showing than ordering visitation over the parent's objection. *Cf. Shofner and Shofner*, 137 Or App 543, 548-49, 905 P2d 268 (1995), *rev den*, 322 Or 644 (1996) (discussing some differences between the two contexts).

[8] In *Harrington*, we noted that *Troxel* modified the interpretation of ORS 109.119 (1997) by moving it in the direction of *Shofner*. 172 Or App at 197-98. In *Shofner*, in turn, we indicated that *Hruby* set the appropriate standards for custody cases. 137 Or App at 548-49. Thus, *Hruby* provides guidance here.

whether the child will be otherwise unduly harmed, physically or psychologically, by giving custody to the natural parent."

*Id.* at 511. Applying that standard, the court concluded that the child's aunt had not presented sufficiently compelling reasons to acquire custody:

"The child has an emotional attachment to the father and wishes to be with him (though also with the aunt). In addition, the child stayed at the father's home in San Diego for six weeks without experiencing any apparent psychological or emotional difficulties. Given these facts * * *, we conclude that there is no compelling reason to deny custody to the father. There has been no showing that the child would not receive adequate care and love from the father or that the child would be otherwise unduly harmed, physically or psychologically, by giving custody to him."

*Id.* at 517-18. *See also Cerda and Cerda*, 136 Or App 104, 109-10, 901 P2d 263 (1995), *rev den*, 322 Or 598 (1996) (applying *Hruby*; father's uncontrolled anger and abusive behavior constitute compelling reasons to place children with grandparents); *Fenimore v. Smith*, 145 Or App 501, 510-11, 930 P2d 892 (1996) (applying *Hruby*; stepfather of adolescent daughter who has suffered "traumatic loss" overcomes parental presumption because removing her from stepfather's house would cause "undue psychological harm" and be "highly detrimental" despite natural parent's fitness).

■■    Thus, to overcome the presumption in favor of father under ORS 109.119(2)(a) (1997), grandparents must establish that the evidence as a whole preponderates in their favor, that is, that father cannot or will not provide adequate love and care for the children or that placement of the children in father's custody will cause them undue physical or psychological harm. Said another way, for a nonparent to prevail on those issues, the weight of the evidence in favor of the nonparent, when considered in light of the evidence in favor of the parent, must be such as to overcome the weight of the presumption. That means that the court must find by a preponderance of the evidence either that the parent cannot or will not provide adequate love and care or that the children will face an undue risk of physical or psychological harm in the parent's custody. We review the evidence in this case to

determine whether grandparents have met that standard. In doing so, we do not balance the benefits to the children of being in father's custody against the benefits of being in grandparents' custody; rather, we determine whether the children would receive inadequate parenting or would suffer undue harm in father's custody.[9]

■    Grandparents argue that father is deficient in the several respects that the trial court identified in its opinion. Although father's actions have not always been optimal, he has been involved with the children's care and upbringing from their birth to the present, and we agree with the trial court's implicit finding that he is a fit parent. Nonetheless, grandparents point out that his involvement with the children while mother was alive was less than hers; that he has a history of job instability that, among other things, meant that Taryn spent his first grade year in three different schools; that the trial court determined that his testimony was not credible; that there is an alleged history of physical and substance abuse in father's family; that father allegedly used illegal substances and allegedly abused mother; that Oliver allegedly has a history of anger and substance abuse problems that allegedly led to her loss of custody of her two older children; and that father was relatively unconcerned about the children's needs arising from mother's death and their need for continuing contact with grandparents.

In contravention to the above evidence, there is evidence that father was actively involved with the children's care and upbringing before mother's death, both before and after the dissolution of their marriage. During the marriage, the nature of his employment kept him away at times, and

[9] One of the difficulties with evaluating the trial court's decision is that it relied heavily on the report and testimony of Dr. Edward Vien, a psychologist who conducted an extensive custody evaluation. Vien, however, focused exclusively on the best interests of the children without regard to father's fundamental right to their care, custody, and control. Thus, his opinions do not deal with the crucial issues that the trial court, and we on *de novo* review, have to decide. The trial court attempted to adapt its opinion to a standard that would take *Troxel* into account, but it was not always fully successful in doing so. For example, the trial court did not evaluate the effect of father's parenting on the children by itself but, rather, compared it to the parenting that it thought they would receive from grandparents. Because Vien did not reach his conclusions in light of the correct legal standard, we do not give his opinions the weight that we might otherwise give them.

after the dissolution of the marriage the location of his employment at times limited his contact with the children, but the evidence is persuasive that he was regularly involved with the children throughout their lives. After mother's death, his involvement with them increased. Although he has changed employment more frequently than might have been in the best interests of the children, he has always been able to find well-paying jobs. At the time of the hearing, he was the lead person for a business that does commercial tenant improvements and home remodeling. Father's employer testified positively about father's work performance and stated that he would permit father to take time off work if the children's needs required him to do so. We note that the children are bonded both to father and to grandparents, although they are somewhat more strongly bonded to father. As to their care in father's custody, Taryn's first-grade teacher testified that Taryn was doing very well in school, had no emotional or behavioral problems, and had generally overcome his earlier difficulty in reading. Seaira was in an appropriate day care program. On the whole, the evidence indicates that the children did well while in father's custody.

Father's lack of candor with the court is of concern but is not decisive. The evidence concerning father's alleged use of illegal substances and abuse of mother seems to be tied primarily to the restraining order and his violation of it in December 1998. On the evening that father was arrested for violating the order, mother went with the children to Miller's, explaining to a friend that she was afraid of father. The arrest occurred when father showed up at Miller's residence. The officer who arrested father testified that he cooperated throughout the process and that he was not intoxicated at the time. About a month afterwards, mother brought the children to the trailer park where father lived for a birthday party for the manager's daughter; it was also father's birthday. Father had begun living in the park shortly before the dissolution became final, and mother and the children visited him frequently while he was there. The manager testified that she never saw any indication of intoxication on the part of father or abuse committed by him. As the trial court indicated, mother appears to have used or ignored the restraining order as best suited her own purposes, including her

desire to remain in control. Moreover, the psychological testing that Vien conducted did not suggest that father is violent or abusive. In light of the evidence as a whole, neither the order nor the December incident indicates that father is a danger to his children, despite his lack of candor with the court.

The primary source of evidence concerning grandfather is mother's dislike of him, as reflected in "wills" that she wrote prohibiting or strictly limiting the contact that he was to have with the children if both mother and father were to die. In contrast, a long-time deputy sheriff, who had a place near grandfather's marina, testified that neither father nor grandfather had a substance abuse problem and that their interactions with the children were normal and appropriate. As to other people in the children's lives if father were awarded custody, there is no evidence that Oliver currently has problems with anger or drug use, even if she did at one time. Finally, to his credit, father has arranged for appropriate counseling to help the children resolve the issues arising from their mother's death, and he indicated at trial that he will continue taking them to their counselor as needed.

In summary, we conclude that the evidence produced by grandparents fails to rise to the level necessary to deprive a biological parent of custody of the children. Accordingly, the trial court erred by awarding custody to grandparents.[10]

Reversed and remanded with instructions to enter judgment awarding custody to father.

---

[10] Grandparents may seek an order under ORS 109.119 providing for visitation with the children in the event that father does not otherwise permit legally adequate visitation in the future.