Argued and submitted November 27, reversed in part and remanded with instructions December 31, 1996

In the Matter of
Kerri Michele Smith, a Minor.

J. Randall FENIMORE,
*Appellant,*

*v.*

Michael SMITH,
*Respondent.*

(95-CV-0334-MS; CA A91534)

930 P2d 892

Mark A. Johnson argued the cause for appellant. With him on the brief was Findling & Johnson.

Steven K. Chappell argued the cause and filed the brief for respondent.

C. H. Gardner argued the cause and filed the brief for child.

Before Deits, Presiding Judge, and De Muniz and Haselton, Judges.

DE MUNIZ, J.

## DE MUNIZ, J.

Petitioner-appellant Randy Fenimore is the stepfather of child Kerri Smith. Respondent Michael Smith is the natural father of child. Following the death of child's mother in February 1995, stepfather brought this action under ORS 109.119,[1] seeking custody of child. The trial court dismissed the action for lack of jurisdiction under the Uniform Child Custody Jurisdiction Act (UCCJA). ORS 109.700 *et seq.*[2] The court also held that, even if it had jurisdiction, it "would find no factors so compelling to justify awarding custody of [child] to [stepfather] and denying her natural father" custody of child. On *de novo* review, we reverse.

Child was born in California in January 1983 and was 12½ at the time of trial. Mother and father, who were married when child was born, were divorced in 1986. The

---

[1] ORS 109.119 provides, in part:

"(1) Any person including but not limited to a related or nonrelated foster parent, stepparent, grandparent or relative by blood or marriage who has established emotional ties creating a child-parent relationship with a child may petition or file a motion for intervention with the court having jurisdiction over the custody, placement, guardianship or wardship of that child, or if no such proceedings are pending, may petition the court for the county in which the minor child resides for an order providing for custody or placement of the child or visitation rights or other generally recognized rights of a parent or person in loco parentis. If the court determines that custody, guardianship, right of visitation, or other generally recognized right of a parent or person in loco parentis, is appropriate in the case, the court shall grant such custody, guardianship, right of visitation or other right to the person having the child-parent relationship, if to do so is in the best interest of the child. The court may determine temporary custody of the child under this section pending a final order.

"* * * * *

"(4) As used in this section 'child-parent relationship' means a relationship that exists or did exist, in whole or in part, within the six months preceding the filing of an action under this section, and in which relationship a person having physical custody of a child or residing in the same household as the child supplied, or otherwise made available to the child, food, clothing, shelter and incidental necessaries and provided the child with necessary care, education and discipline, and which relationship continued on a day-to-day basis, through interaction, companionship, interplay and mutuality, that fulfilled the child's psychological needs for a parent as well as the child's physical needs. However, a relationship between a child and a person who is the nonrelated foster parent of the child is not a child-parent relationship under this section unless the relationship continued over a period exceeding 18 months."

[2] Father raised no issue under the federal Parental Kidnapping Prevention Act, 28 USC § 1738A.

California decree awarded joint legal custody to mother and father with physical custody to mother. In October 1985, mother began living with stepfather, and the couple married in February 1988. Since the age of 2½, except for a period of about seven months in 1987, child has been raised in stepfather's home. Child has one half-sister, Laura, who was six years old at the time of trial.

Until 1994, the family lived in Grimes, California. Mother was an accomplished horsewoman, and, for several years, the family contemplated a move to Bend. Beginning in the spring of 1993, stepfather began to spend much of his time in Bend, and in September 1994, the family moved to Bend, where they have horse facilities.

Mother suffered from arrhythmia, a heart irregularity. People who knew mother, including child, were aware of her condition. One Saturday morning, when stepfather was away from the home, child and her sister got into a quarrel about the toilet tissue not being on the roll.[3] Mother became angry and commented that her heart had gotten out of rhythm. Shortly after, child heard her mother stumble and make a noise. Child called out to her mother, and, when her mother did not respond, child went to see what was happening. Child discovered her mother in a condition of "virtual death."[4] Child tried to phone her stepfather, and, when he did not answer his cellular phone, child called a friend who, in turn, called 9-1-1. Before the ambulance arrived, child tried unsuccessfully to keep her sister from seeing her mother. Responders at 9-1-1 called child and asked if she wanted to try CPR but child did not, later telling her counselor that she was afraid she would not do the right thing. Mother was taken to the hospital but had suffered kidney failure and died early the next morning.

Child has lived in the same house in Bend continuously since September 1994. After mother died, stepfather sold his business so that he could stay home with child and

---

[3] The circumstances of mother's death were given in testimony by child's counselor, Palmer, who related what child had revealed to her.

[4] Palmer, who had been a registered nurse, described mother's dying condition: "Her hands, face and tongue were blue, if not black, her eyes were protruding, and she was unable to breathe effectively."

her half-sister. There are also a daytime housekeeper and bookkeeper at the Bend home. Stepfather expects to be able to live off the proceeds from the sale of his business and not return to work for five years. In the two years before trial, father had seen child five times, including a brief contact at mother's memorial service in California. He has maintained frequent contact by telephone and mail.

In May 1995, stepfather petitioned the court for appointment as child's conservator and guardian.[5] In July, father threatened to remove child from her home and to pursue criminal and civil actions against stepfather if he did not cooperate. Stepfather then filed this proceeding on July 27. He was granted a temporary custody order and order prohibiting a change of child's residence or removal from Oregon. On July 31, father filed a motion to vacate the temporary orders. That motion was denied after a hearing, and after the Oregon court had consulted with the California court.

On August 16, in California, father filed a motion in the divorce action, asking for and obtaining an order awarding him custody of child. Stepfather was not made a party in that proceeding. The California court later vacated the order. The court noted that, following mother's death, father had custody by operation of California law.[6] The California court specifically noted that "[Stepfather] is not a party to this action at this time" and dismissed father's motion "insofar as it is directed to a non-custodial party[.]"

In December, following a three-day hearing, the trial court dismissed stepfather's petition for lack of jurisdiction.[7] Stepfather assigns error to that dismissal and to the trial court's concurrence with the California court's conclusion that it, and not Oregon, has jurisdiction over child's custody. Although child is technically a respondent in this appeal, she joins stepfather in his arguments and has filed a brief asking for reversal of the court's judgment.

---

[5] That action was consolidated with the custody case and was settled at trial. No issues concerning that action are present in this appeal.

[6] California Family Code § 3010(b) provides that, "[i]f one parent is dead, * * * the other parent is entitled to custody of the child." Oregon has a comparable provision. ORS 109.030.

[7] The court's judgment has been stayed pending appeal.

■     The trial court did not give the basis for its jurisdictional determination. However, we agree with stepfather and child that Oregon has jurisdiction to determine child's custody under the UCCJA, and that the trial court erred in not exercising that jurisdiction.

It is important to keep in mind that this is an initial action seeking custody pursuant to ORS 109.119. The trial court specifically found—and the evidence unequivocally shows—that stepfather has an emotional child-parent relationship as defined in ORS 109.119. *See* note 1, above. Under the UCCJA, an Oregon court has jurisdiction to make a child custody determination if the facts show a jurisdictional basis under ORS 109.730(1). There are four bases for determining jurisdiction in ORS 109.730(1), *Stubbs v. Weathersby*, 320 Or 620, 624, 892 P2d 991 (1995), and two existed at the start of this proceeding. Oregon is the home state of child, who had lived in this state for more than six months. ORS 109.730(1)(a); ORS 109.710(5). Additionally, as discussed below, it was in the best interest of the child for Oregon to assume jurisdiction because it is Oregon that has substantial evidence concerning the child's present and future care and personal relationships. ORS 109.730(1)(b).

However, under the UCCJA even if there is a jurisdictional basis in Oregon for this child custody proceeding, Oregon would be barred from exercising that jurisdiction if there were a pending custody action in another state at the time the Oregon petition was filed, ORS 109.760, or if a modification of another state's custody decree was sought and that state retained and had not declined jurisdiction, ORS 109.840. Here, neither bar applies. There was no pending custody action when stepfather brought this proceeding.[8] The modification bar of the UCCJA is also inapplicable as this is an initial custody proceeding between stepfather and father, not the modification of the divorce decree between mother and father.

_____

[8] Father's California motion regarding custody was filed after stepfather filed this proceeding. Under that circumstance, the Oregon court's obligation was to inform the California court of the Oregon action. ORS 109.760(2). Here, the Oregon court was in contact with the California court more than once.

■ The Oregon court was not barred from exercising jurisdiction. However, the court could decline to exercise that jurisdiction on a finding that the Oregon court was an inconvenient forum. ORS 109.770. The trial court noted that the California court had considered the following factors:[9]

"(a) There is a California divorce decree;

"(b) At the time of the California divorce decree, both [father and mother] were subject to the jurisdiction of the court in California;

"(c) The child * * * has spent more than 11 years of her 12½ year life in California; and

"(d) There are a large number of extended family members from both the maternal and paternal sides in California."

■ If, from those factors, the trial court concluded that California was a more appropriate forum, it erred. The purpose pervading the UCCJA is to provide that child custody determinations will be made in the state where there is optimum access to evidence. *Grubs v. Ross*, 291 Or 263, 270, 630 P2d 353 (1981). That evidence must focus on the issue that is before the court. Thus, in *Henry and Keppel*, 143 Or App 203, 206, 922 P2d 712, *rev allowed* 324 Or 487 (1996), we held that, although there was readily available evidence as to visitation in California where the child continued to visit her father after a California divorce, the most readily available evidence regarding custody was in Oregon, where the child had lived for more than eight years.

This is a proceeding between stepfather and father, and the factors considered by the California court, which might be ones appropriate to determining custody in the context of the divorce proceeding between mother and father, are not relevant. Completely absent from the factors cited by the California court is any consideration of the availability of evidence as to the effect of mother's death on child and the location of evidence concerning child's present and future care,

---

[9] The trial court agreed with the "analysis and legal conclusion" reached by the California court, "believing that the reasoning of [the California court] was sound and that [the California court's] memory of what had transpired factually in the past was good."

protection and personal relationships in the light of that event. To make a custody determination in a forum in which that evidence is not readily available ignores the critical importance of the circumstances of mother's death and their impact on child's life. As Palmer, child's counselor, testified:

> "In terms of my personal professional awareness and in terms of what I read in many research papers, this is as close to the worst scenario that you could impose upon a child as possible. One of the problems is that she was the only person there to take action. A second problem was that she had every reason to believe that she must have caused this because she had a quarrel with her little sister about the toilet paper. Another reason is that she called other people instead of 911 first. Another reason is that they offered her the opportunity to do CPR and she declined. I mean, if she had tried it and her mother had died anyhow, which she would have, she could say at least I tried, but now she can't even say that. And the fact that she has had such a blunted response, that she just isn't an emotionally expressive person. I also have spoken briefly with school people who say that when she was on her way to attend her mother's funeral in California, she was asking the teachers what she should do for homework. This is a real indication that she was so traumatized that she couldn't let it all in. And according to the literature, the only worse trauma that children can suffer is actually seeing their parent's suicide, that that is a worse trauma. That there's not any doubt in my mind that both [child] and Laura have suffered significant, if not massive trauma."

There was no showing that substantial evidence of the effects on child of her mother's death was available in California. That evidence is almost entirely from Oregon witnesses— child's counselor, school teacher, stepfather, and child. Under the UCCJA there was a jurisdictional basis for making a custody determination and no bar to that jurisdiction. The circumstances show that there was no more appropriate forum in which to decide custody. The trial court erred in finding that it did not have jurisdiction.

■ Stepfather next assigns error to the trial court's alternative finding that, if it had jurisdiction, it would not find compelling factors so as to deny father custody of child

and to the court's failure to award custody to stepfather.[10] In *Hruby and Hruby*, 304 Or 500, 748 P2d 57 (1987), an aunt who had cared for the child for most of the child's life sought custody under ORS 109.119, asserting that the statute gave her a substantive custodial right to the child, and, therefore, deciding custody should be determined on the "best interests" of the child. The Supreme Court held that a natural parent has the right to custody of a child in the absence of a compelling reason for placing the child in the custody of another. *Id.* at 509. Stepfather argues, first, that there are compelling reasons here. Alternatively, stepfather contends that the "compelling reasons" standard is inapplicable where the dispute involves a stepparent who has assumed the parental role.

We do not address whether a different standard applies in the case of a stepparent, because we agree that "compelling reasons" exist to award custody to stepfather. There is no question but that father loves child and can provide her physical needs. However, those are not the only considerations. As the Supreme Court noted in *Hruby*:

> "We use 'compelling' to emphasize that in a custody dispute between a natural parent and some other person, a court should not be concerned with attempting to maximize a child's welfare, but with determining whether the child will receive adequate care and love from its natural parent and *whether the child will be otherwise unduly harmed, physically or psychologically, by giving custody to the natural parent*." 304 Or at 511 (emphasis supplied).

The evidence shows that child will be harmed if custody is granted to father. We need go no further than the testimony of Palmer, whom the trial court found "very credible":

---

[10] Father responds that he "does not concede that this issue is properly before the court on appeal at this time." Father filed a "special appearance (*not waiving* his challenge to subject matter jurisdiction[.])" The appearance included affirmative defenses and counterclaims. Trial was not limited to the jurisdictional issue; custody was before the court, and both parties presented evidence. Furthermore, on appeal, father does not argue that we should not address the custody issue. Rather, he concedes that "it may ultimately be in the interest of judicial economy if the Court of Appeals addresses the custody issue now" and asks us to affirm "on the merits of the custody issue." The issue is properly before us.

"My opinion is very clear and very emphatic that it would be a very great risk for [child] to be relocated in any other home than [stepfather's] home at this time. And that, specifically, she needs to be with people whom she trusts and with whom she has total confidence that she can live. It also would be close to an unendurable trauma for both her and Laura if they were separated. That would be like, for Laura that would be like the death of another mother, in a way, because obviously a younger sibling looks to the oldest sibling as being kind of a mother surrogate. That happens when mothers are living. And certainly more when mothers have died. For [child], the real risk in being without Laura, I mean there are all of the standard risks of sibling separation, which would be, you know, just extremely traumatic, but Laura is the most emotionally expressive person in the home. And [child] will be able to do some of her emotion work through Laura that she wouldn't be able to do if she was with people who weren't emoting the way Laura does."

Child is an adolescent.[11] She is well adjusted at school and involved in many activities, including horse riding. She is close to her half-sister. Child testified that she wants to stay in Oregon with stepfather and her half-sister, which she described as "her family that she's lived with all her life." She wants only limited contact and visitation with father.[12] Child has suffered a traumatic loss from which the testimony shows she is not likely to heal if she is forced from the only family situation she has ever known. Under the circumstances of this case, an award of custody to father would cause undue psychological harm to child. *See Langenberg v. Steen*, 213 Or 150, 322 P2d 1087 (1958) (to change only home known by 15-year-old under circumstances would be

---

[11] As the pro tem judge explained in denying father's motions to set aside the temporary custody order: "[T]he child is old enough to express her preference at this point in time[.]"

[12] Child does not feel safe in father's home and told Palmer that she never stayed alone with father when she went for visits. Although the reasons for her fear are unclear, there were suggestions that father had abused mother during the marriage and that such abuse had taken place in child's presence. Father admitted that he engaged in "shoving" matches with mother but denied having "struck" her. Child also perceives her father as having a drinking problem. Palmer testified that the important point was not whether father could actually provide a secure environment: "The relevant question is why does [child] not feel safe? If [child] doesn't feel safe, then we have to create the feeling of safety within her. You can't * * * assure it from the outside."

highly detrimental to the child's welfare, regardless of natural parent's fitness). The trial court erred in concluding otherwise.

Judgment of dismissal reversed; remanded with instructions to enter judgment awarding custody of child to stepfather with reasonable visitation to father.