Argued and submitted April 30; resubmitted en banc October 15, 2002, reversed and remanded with instructions January 8, 2003

Bobbie STROME,
*Respondent,*
*and*

Garth STROME,
*Appellant,*
*and*

Suzanne E. STROME,
*Respondent-below.*

99-CV-0259-MA; A111369

60 P3d 1158

Russell Lipetzky argued the cause and filed the briefs for appellant.

Helen T. Dziuba argued the cause for respondent. With her on the brief were Melissa P. Lande and Bryant Lovlien & Jarvis PC.

Before Deits, Chief Judge, and Edmonds, Landau, Haselton, Armstrong, Linder, Wollheim, Kistler, Brewer, and Schuman, Judges.

EDMONDS, J.

Deits, C. J., dissenting.

## EDMONDS, J.

Father appeals from a trial court judgment pursuant to ORS 109.119 that awarded custody of his children to grandmother, who is father's mother. The issue is whether grandmother has proved by a preponderance of the evidence that father cannot or will not provide adequate love and care for the children or that placement of them in his custody will cause an undue risk of physical or psychological harm to them. Encompassed within that burden of proof is a statutory and constitutional presumption in favor of father that grandmother must overcome. *See O'Donnell-Lamont and Lamont*, 184 Or App 249, 56 P3d 929 (2002). On *de novo* review, we reverse because grandmother has not overcome the presumption that favors biological parents in custody disputes between parents and nonparents.

Father and mother, his former wife, had three daughters, B, E, and H. The children were 10, 8, and 6 years old in June 2000, the time of the custody hearing. In 1995, father and mother were separated, and a petition to dissolve their marriage was pending. The children were living with mother in Bend, while father was living in Portland. During the dissolution proceedings, grandmother and father learned that mother had exposed the children, particularly B, to sexual and other abuse while they were in her care. With grandmother's help, father obtained temporary custody of the children and moved them and himself to grandmother's home in Bend, where they stayed until 1999.[1]

Before he returned to Bend, father was working at a bar in Portland. He had also engaged in prostitution for money and drugs. In 1993 and 1994, he was drinking heavily, using drugs, and talking about suicide. His family planned an intervention on his behalf, but he avoided participation in the effort. When father first moved back to Bend in 1995, he had only limited involvement with the children. He cooked many of their meals and spent time with them in the afternoons, but he rarely attended parent-teacher conferences or

---

[1] Mother did not appear at the hearing on grandmother's petition for custody of the children, and the court entered an order of default as to her. So far as the record indicates, she does not have any visitation rights.

other school functions. Father had difficulty controlling his temper with the children, and when he was angry he yelled at them and called them obscene names. He spent most of his time working on the computer, much of it at night, with the result that he slept during a large part of the day. Grandmother had a more significant role in the children's lives than did father, although she frequently worked well into the evening and got home after the older children were in bed. H was especially attached to grandmother and stayed up late to see her, compensating by taking naps during the day (she was too young for school). Two of father's sisters also played important roles in caring for the children; one of them, together with her two daughters, lived in the family home for over a year.

Father did not have a steady job while he was in Bend, but he worked on a number of computer projects, which, among other things, helped him to develop his skills in the field. He began with a website and other work for grandmother's real estate business and moved onto similar work for other Bend businesses. The record does not indicate how much he earned from that work, but it is clear that grandmother provided the primary financial support for both him and the children while they lived with her. In the first years that he lived in Bend, father also used drugs occasionally, and in a few instances he was an escort for older, wealthier men, including accompanying one on a business trip to Japan. Father appears to recognize in his brief that his actions during those years would justify an award of custody to grandmother under any standard.

In late 1997, father met Michael Chism, a truck driver who lived in Roseburg and who is about 15 years older than father. Chism has two children; one was in college and the other, who apparently is about E's age, visited him every other weekend. Father and Chism developed a relationship and began visiting at each other's homes. Father occasionally took the children with him to Roseburg. Chism is an alcoholic, and at times father's relationship with him involved excessive drinking. However, in other ways father saw Chism as a mature role model, particularly with regard to Chism's responsibility toward his children. In late 1998 or early 1999, father decided to move to Chism's house in

Roseburg and to take the children with him. At about the same time, a confrontation with B led him to realize that his yelling and swearing at the children was inappropriate and damaging, and, according to both of them, he stopped that kind of conduct.[2]

Father moved the children into Chism's house in Roseburg at the end of May 1999, shortly before the end of the school year, and enrolled them in Roseburg schools. In early June, grandmother filed this petition and obtained a temporary custody order; the police took the children from their Roseburg schools without notice to father and returned them to Bend. Father regained custody in August and continued to exercise custody up to the time of the hearing in June 2000, subject to frequent visitation with grandmother. It is of some significance that at that time the trial judge in this case, acting as a juvenile court judge, returned the children to father rather than placing them with grandmother. After moving to Roseburg, father obtained a job that allowed him flexibility to be with the children and to participate in school activities.

In contrast to his actions during his early years in Bend, father's parenting of the children in Roseburg in the 10 months before the hearing was exemplary, and the uncontroverted evidence is that the children thrived in their home in Roseburg. Father was actively involved in all aspects of their lives. He got them ready for school every morning and walked the younger girls to their school a few blocks away. B's school was across the street, and she usually went by herself. He picked up the two older girls at the end of the school day. For much of the year, Chism picked up H when he was in town. However, shortly before trial he went on an alcoholic binge and was incapacitated for several days. Thereafter, he entered a rehabilitation program, and the daycare provider took over the task of picking up H. There is no evidence about what impact, negative or otherwise, Chism's difficulties had on the children.[3]

---

[2] There is no evidence that father's outbursts have continued since that confrontation and his change in behavior.

[3] The dissent refers to an incident in which Chism was incapacitated by alcohol when H came home. It fails to point out that father insisted that Chism get help and made it clear to him that, otherwise, he and Chism could not continue living

During the same time period, father was active in the children's schools, assisting in their classrooms and accompanying them on field trips. At home, each of the children had appropriate chores. Father helped them with any homework. He was appropriately warm and affectionate with them. In the evening, they read and watched television. Father took care to avoid exposing them to inappropriate programs and videos. The children played at a basketball hoop in the backyard (there is a special bucket on the ground so that H can also participate). The children testified that they enjoyed living with father and that they preferred to stay with him.[4]

All of the children did well in school while they were in Roseburg. Their teachers uniformly described them as bright and articulate and said that they made friends easily. B began the year almost two grades below grade level in mathematics but finished the year at or above grade level. One teacher rated father's participation in school activities as being in the ninetieth percentile among parents. No teacher indicated that the children showed signs of being at risk or in need of counseling. B's school counselor testified that the best

---

together. As a result, Chism entered the rehabilitation program. Grandmother testified that H told her about the incident two or two and one-half months before the hearing. Father testified that Chism's relapse occurred about one month or one month and one-half before the hearing. Because of the additional details that he described, we find father's recollection to be more accurate. We also conclude that there was only one relapse rather than, as the dissent believes, two separate incidents. It is clear that father provided alternative daycare for the children afterwards and no longer relied on Chism for that purpose.

[4] There is some suggestion in the record that B may have organized a united front on that point. There is also evidence that the previous summer, before the hearing that returned temporary custody to him, father encouraged the children to testify in his favor. In reaching its decision, the trial court apparently gave considerable weight to a tape recording of a telephone conversation that he had with the children on that subject. Because the tape was a year old at the time of trial, involved a different hearing, and came before the time period that father had custody, we do not give it the weight that the trial court did or the dissent does. In any event, we give the children's testimony about their custody preferences little weight in light of their ages. What we find more persuasive is the uncontradicted evidence of father's healthy and extensive involvement with the children in the 10 months preceding the trial in this case. We note, incidentally, that the reason that the tape exists is that grandmother would not let the children talk with father unless the conversation was recorded or took place on a speaker phone with someone else present. That fact, among other things, undercuts the dissent's argument that grandmother will encourage the children's relationship with father.

thing for her to do to overcome any problems from her previous experiences was to get on with her life, and, in the counselor's opinion, she was succeeding in that endeavor. Grandmother does not seriously contend that she would be entitled to custody if the only evidence of father's care of the children related to the period of time that the children lived with him in Roseburg. Despite the above evidence, the dissent appears to give little or no weight to the evidence of father's care and interaction with the children while they were living with him in Roseburg.

Also, two experts conducted studies related to the custody issue. They had different purposes for their studies, differences that affect the weight to be given to their testimony. Dr. Catherine Bolstad, a psychologist, conducted a custody study in which her focus was on comparing grandmother and father as potential custodial parents. Her primary interest was to determine the best interests of the children, and she did not give any particular weight to father's status as the biological parent. In contrast, Joseph Mazza, a licensed clinical social worker, conducted a home study and parenting evaluation of father to determine the current conditions and circumstances of the family. He did not attempt to compare father's home with grandmother's but, rather, to evaluate it in light of his experience with many other homes and his knowledge of general theory about parenting. Those different purposes affected the nature of the information that the experts gathered and the conclusions that they reached based on that information. Mazza's focus is closer to the matters that are relevant to the applicable legal standard than is Bolstad's. As a result, his information and opinions are generally more helpful in deciding this case than are Bolstad's.[5]

Bolstad conducted extensive interviews with father, Chism, grandmother, and others, observed the children interacting separately with the two potential custodial families in her office, received information from other sources, and administered psychological tests. She did not visit either

---

[5] If we were to find that grandmother had rebutted the presumption, we would then need to decide the best interests of the children. Bolstad's information and opinions would be more directly relevant to that issue.

home, in part because she believes that home visits frequently lead to an artificial environment as those involved put on a show for the observer. Mazza interviewed father and Chism, administered psychological tests, and spent many hours observing the family at home, including over five hours with the children alone. He testified that observing the children in their home environment was crucial to understanding how they and father actually related to each other.

Neither Bolstad nor Mazza found indications of significant psychopathology in either father or grandmother. Although Bolstad was concerned that father might have a tendency toward narcissism and placing his interests ahead of the children's, Mazza saw no indication of that problem in his observations of the home environment in Roseburg. Bolstad recommended that grandmother receive custody for several reasons: (1) at least in part because of their experiences with their mother, the children need a good parent more than normal children do; (2) the children had lived with grandmother from 1995 to 1999; (3) father has a history of drug and alcohol involvement and had not been involved in the children's school work and care until recently; (4) father's taking the children out of school and moving to Roseburg shortly before the end of the school year demonstrated his unwillingness to put the children's needs ahead of his own; (5) father does not adequately value the children's relationship with grandmother; (6) father treats the children like adults and does not set limits and boundaries for them; and (7) the children, especially B, need counseling, which, in Bolstad's opinion, father was less likely to provide than was grandmother.

We turn now to a description of the applicable legal standard in a case involving a custody dispute between a biological parent and a nonparent who has developed a child-parent relationship with the children.[6] Because grandmother filed her petition before the effective date of the 1999 version of ORS 109.119, the controlling statute is ORS 109.119

---

[6] As we noted in *O'Donnell-Lamont*, 184 Or App at 253 n 4, the relevant Oregon cases have all involved a biological parent and a nonbiological nonparent. We do not mean by our references to that fact to suggest that the rights of an adoptive parent would be different from those of a biological parent. *See* ORS 109.350.

(1997). *Williamson v. Hunt,* 183 Or App 339, 343-44, 51 P3d 694 (2002). ORS 109.119(2)(a) (1997) authorized a court to grant custody to a grandparent or other person who had a child-parent relationship with the child if the court determined by a preponderance of the evidence that it was appropriate and in the best interests of the child to do so.

The statute must be interpreted in the context of the applicable federal constitutional law. In *Wilson and Wilson,* 184 Or App 212, 55 P3d 1106 (2002), we considered at length the impact of the United States Supreme Court's decision in *Troxel v. Granville,* 530 US 57, 120 S Ct 2054, 147 L Ed 2d 49 (2000), on the 1997 version of ORS 109.119. We concluded that, under *Troxel,* biological parents have a fundamental due process right " 'to make decisions concerning the care, custody and control of their children.' " *Id.* at 217 (quoting *Troxel,* 530 US at 66). After discussing decisions of the Oregon Supreme Court and this court, we held that that fundamental constitutional right supervenes a pure "best interest of the child" analysis in a custody dispute, "replacing it with one in which a fit biological parent will presumptively prevail over a nonparent unless the nonparent presents compelling reasons to overcome that presumption[.]" *Id.* at 219. Thus, the threshold issue is whether grandmother has proved that father "cannot or will not provide adequate love and care or that the children will face an undue risk of physical or psychological harm in [father's] custody." *O'Donnell-Lamont,* 184 Or App at 256-57.

In light of the above legal standards, we turn back to the evidence. When the children lived with grandmother from 1995 to 1999, they also lived with father, who despite his problems played a significant role in their lives. Although his role as a parent was clearly inadequate, it was not the total nullity that the dissent suggests, and it improved in the later years. Father's history of drug and alcohol abuse during that period of time is probably the most serious concern to us, particularly in light of Chism's continuing difficulties. Father insists that he enforces a "zero tolerance" policy for drugs in the home, and Mazza did not find anything to the contrary during his extensive home study. As with other aspects of father's dramatic change in behavior, we cannot be entirely certain how longlasting those changes will be. Nonetheless,

the record does not permit us to speculate that the children are presently at risk because of exposure to drugs if father is given custody, particularly in light of the presumption in his favor.

The other issues that concerned Bolstad also do not overcome the presumption. Father might have appropriately delayed the move to Roseburg, but, in light of his overall relationship with the children after the move, we are not persuaded that he placed his interests ahead of the children. Father testified that he does not think that the children need to see grandmother as often as the court ordered, and he clearly resents what he sees as her interference with his role as their parent. Parental decisions about the extent of contact with third parties are the kinds of decisions that are presumptively protected by the constitution. However, father also believes that the children and grandmother should remain close, and he has placed far fewer restrictions on their communication with her while they are in his home than she placed on their communication with him when she had custody.[7]

Bolstad's concern that father treats the children like adults appears to be based in part on how B was dressed when she came for the interview that Bolstad conducted with father, compared to how she was dressed when she came with grandmother. Again, we are persuaded that the evidence in this regard is insufficient to overcome the presumption in favor of father. Finally, although Bolstad believed that the children needed counseling, the school counselor disagreed. Also, Mazza did not perceive the level of distress that would ordinarily require counseling, although he did not believe that counseling would be harmful to the children, particularly in light of the relationship between father and grandmother. On this record, father's decision not to provide counseling unless the children request it does not rise to the level that would persuade us that granting custody to father

---

[7] If visitation is unduly restrictive in the future, the court has authority to award appropriate visitation under current ORS 109.119(3)(a) to ensure that the children have adequate contact with grandmother, after taking into account father's constitutional rights as a biological parent.

will cause an undue risk of psychological harm to the children, as would be required to overcome the presumption.

Nonetheless, we have two continuing, significant concerns based on the record before us. First, there is the evidence of Chism's alcoholism and its effect or potential effect on the home environment if father is granted custody. Secondly, and related to our first concern, we cannot be certain that father's turnaround will continue. Mazza's testimony that people often make significant life changes between the ages of 28 and 32, which is father's age group, gives reason for hope, but father's previous life-style, especially before 1995, weighs against that hope. Mazza suggested in his testimony that father could benefit from counseling or parenting classes, and we agree that those things could help reinforce the other changes that he has made.

What weight to give those concerns depends on to what extent they are predictors of the future, and, ultimately, we must decide whether those concerns suffice to rebut the presumption in favor of father that is part of the constitutional right that the Supreme Court described in *Troxel*. We are mindful that what we decide in this case about the sufficiency of the evidence in that regard constitutes precedent for purposes of other cases. However, each case must be decided on its own facts. Here, each concern is ameliorated by the fact that father exercised his parenting responsibilities in exemplary fashion for the 10 months that he had custody. That performance tends to render our concerns about the future speculative. Because of the speculative nature of those concerns, we conclude that we cannot give efficacy to the presumption and at the same time award grandmother custody on this record. Our concerns must give way to the law pursuant to *Troxel*. Consequently, we hold that grandmother has not overcome the presumption that is accorded father because he is the biological parent. It follows that he is entitled to custody of the children.

In reaching a different conclusion, the dissent fails to give adequate consideration to the legal standard that we must apply. Although it states that standard correctly, 185 Or App at 541-42 (Deits, C. J., dissenting), it does not use it in evaluating the evidence. The heart of the standard is that we

analyze *only* whether father can provide adequate love and care for the children and whether they are at undue risk of harm in his custody. It is simply irrelevant to that determination whether grandmother might provide better care, for that consideration lapses back into a "best interests" test that is inapplicable. The dissent nevertheless relies heavily on Bolstad's report and testimony, even though Bolstad's express purpose was to make a custody determination based on the best interests of the children. In addition, Bolstad refused to visit father and the children at home to assess what was occurring outside the somewhat artificial environment of her office.

Some of Bolstad's concerns, which the dissent echoes—particularly that the children might be at risk because of what they experienced while they were living with their mother or that they will suffer undue psychological harm if removed from grandmother's custody—simply do not have any support in the evidence of their current situation. Witnesses who had no interest in the outcome of the case (their teachers and school counselor) uniformly stated that the children were doing well and that they demonstrated no indicators of needing counseling; thus, neither the negative effects that they may have experienced with their mother nor any negative effects from their removal from grandmother's custody are apparent from their current behavior. Indeed, as the school counselor pointed out, it is often better for children to move on with their lives than to focus on things that happened previously. Because of the nature of Bolstad's study, including its comparative nature and its focus on the past rather than the present and future, and because of the more current evidence of the children's behavior and living situation in the 10 months leading up to trial, we do not give Bolstad's testimony the weight that the dissent does.

In contrast to Bolstad's testimony, Mazza's home study focused on precisely the issues that are the most relevant to our decision. He evaluated how the children were doing with father, not how they might do with grandmother, and he concluded that they were doing very well. The dissent

suggests that Mazza was not sufficiently aware of the situation while father lived in Bend because he spoke only to people whom father suggested.[8] However, as the dissent notes, Mazza reviewed Bolstad's report before conducting his study and thus was aware of her findings. The dissent does not explain why it was inappropriate for Mazza to rely on Bolstad's interviews of the people that she had interviewed and to spend his time speaking with additional people whom Bolstad had not seen.

We also give weight to Mazza's experience with the children's protective services unit of the State Office of Services to Children and Families; he is currently the supervisor of 13 caseworkers in that unit. As a result of that experience, he is both aware of the factors involved in creating an environment that may present a danger to children and of the differences between a family that is at risk and one that is not. Unlike Bolstad, Mazza spent many hours observing father and the children in their home in Roseburg. That time included five hours with the children when father was not present. In light of Mazza's experience and the time he spent with father and the children, we find his testimony highly probative.

What the dissent does not fully appreciate is that Mazza provided the most probative evidence regarding how father and the children will relate to each other in the home in the future. Bolstad's opinion focused on the time period *before* the children lived with father in Roseburg, as did grandmother's other evidence. While that evidence could be helpful in predicting how father and the children will relate in the future, it does not take into account the time period closest to trial. Only Mazza described how the children related during the most recent time period, which may well

---

[8] The dissent notes the trial court's criticism that Mazza spoke only with people who were favorable to father. As we point out, he was aware through Bolstad's report of people who were unfavorable. Mazza's purpose was to evaluate father and the home that father provided for the children, not to compare it with an alternative home. To some extent, the trial court's comment reflects its assumption—which the dissent seems unable completely to shed—that its role was to compare the home that father provides with the alternative of grandmother's home. That, however, is precisely contrary to the standard that *Troxel* requires us to adopt.

be the best predictor of how they will relate in the future. The picture that he provided is remarkably favorable to father, and he provided cogent reasons for believing that it will probably continue to be favorable. He recognized—as we recognize—that father's previous actions raise concerns and that there are no guarantees of future behavior.[9] We agree with him, however, that those concerns, by themselves, are insufficient to show by a preponderance of the evidence that father cannot provide adequate love and care to the children or that they will suffer an undue risk of harm in his custody. As a result, father is entitled to custody.[10]

Reversed and remanded with instructions to award custody to father.

**DEITS, C. J.,** dissenting.

The majority recites the legal standard that we apply in resolving a custody dispute under ORS 109.119 (1997) between a parent and a nonparent in light of the United States Supreme Court's decision in *Troxel v. Granville*, 530 US 57, 120 S Ct 2054, 147 L Ed 2d 49 (2000).[1]

---

[9] We do not hold, as the dissent suggests, that the time that the children lived with father *necessarily* ameliorates father's previous inadequacy. *See* 185 Or App at 545-46 (Deits, C. J., dissenting). Rather, on the facts of this case we find the more recent period to be more predictive of father's future actions than the more remote period.

[10] In the final analysis, it appears that we and the dissent disagree about the weight to be given the evidence that father's parenting was exemplary for the 10-month period of time immediately before trial. That in itself may reflect a disagreement about whether it is possible for father to change. We believe that it is possible. We acknowledge that this is a close case, but it also illustrates the importance of the constitutionally required presumption in favor of a biological parent. If the presumption is to have efficacy in a close case, it must be the presumption that becomes the determining factor. It is in accordance with that understanding that we hold in favor of father.

[1] ORS 109.119 (1997) provides, in part:

"(1) Any person, including but not limited to a related or nonrelated foster parent, stepparent or relative by blood or marriage who has established emotional ties creating a child-parent relationship or an ongoing personal relationship with a child, or any legal grandparent may petition or file a motion for intervention with the court having jurisdiction over the custody, placement, guardianship or wardship of that child, or if no such proceedings are pending, may petition the court for the county in which the minor child resides for an order providing for relief under subsection (2) of this section.

"(2)(a) If the court determines that a child-parent relationship exists and if the court determines by a preponderance of the evidence that custody, guardianship, right of visitation, or other generally recognized right of a parent or

The focus of my disagreement with the majority is its application of the standard to the facts of this case. Accordingly, I dissent.

In our recent decision in *Wilson and Wilson*, 184 Or App 212, 218-19, 55 P3d 1106 (2002), we described the rebuttable presumption in favor of a parent in custody disputes between a parent and a nonparent:

> "*Troxel, Harrington* [*v. Daum*, 172 Or App 188, 18 P3d 456 (2001)], and *Newton* [*v. Thomas*, 177 Or App 670, 33 P3d 1056 (2001)], then, alter the interpretation of ORS 109.119 [(1997)] in *Sleeper* [*and Sleeper*, 328 Or 504, 982 P2d 1126 (1999)]. Instead of basing custody or visitation decisions on a 'best interest of the child subject to supervening parental right' analysis, we now give 'significant weight' in that calculus to a fit biological parent's fundamental right to determine the care, custody, and control of his or her children. As the *Troxel* plurality phrased that idea, we give force to 'the traditional presumption that a fit parent will act in the best interest of his or her child.' *Troxel*, 530 US at 69. The presumption approaches in strength the one we adopted in *Shofner* [*and Shofner*, 137 Or App 543, 905 P2d 268 (1995), *rev den*, 322 Or 644 (1996)], which could be overcome only for compelling reasons. Thus, a fit biological parent's right is 'supervening' not in the sense that it always and necessarily 'supervenes' or trumps the outcome of a pure 'best interest of the child' inquiry, but in the sense that the right 'supervenes' the pure 'best interest' analysis itself, replacing it with one in which a fit biological parent will presumptively prevail over a nonparent unless the nonparent presents compelling reasons to overcome that presumption, for example by showing that a ruling in favor of the biological parent will harm the child."

We further explained in *O'Donnell-Lamont and Lamont*, 184 Or App 249, 256-57, 56 P3d 929 (2002), that, to rebut the presumption in favor of a parent, the nonparent

> "must establish that the evidence as a whole preponderates in [his or her] favor, that is, that [the parent] cannot or will

---

person in loco parentis, is appropriate in the case, the court shall grant such custody, guardianship, right of visitation or other right to the person, if to do so is in the best interest of the child. The court may determine temporary custody of the child or temporary visitation rights under this paragraph pending a final order."

not provide adequate love and care for the children or that placement of the children in [the parent's] custody will cause them undue physical or psychological harm. Said another way, for a nonparent to prevail on those issues, the weight of the evidence in favor of the nonparent, when considered in light of the evidence in favor of the parent, must be such as to overcome the weight of the presumption. That means that the court must find by a preponderance of the evidence either that the parent cannot or will not provide adequate love and care or that the children will face *an undue risk of physical or psychological harm in the parent's custody*."

(Emphasis added.) *See also Moran v. Weldon*, 184 Or App 269, 274-75, 57 P3d 898 (2002) (stating that, under the rule derived from *Troxel*, "there must be proof that the biological parent cannot or will not provide adequate love and care for the child or that the child *will be at an undue risk of harm* in the parent's custody" (emphasis added)).

Similarly, in *State v. Wooden*, 184 Or App 537, 551-52, 57 P3d 583 (2002), we elaborated on the manner in which a nonparent can rebut the presumption in favor of a parent:

"[The parent's] rights create a rebuttable presumption, and we must now determine whether [the nonparents] have rebutted it. In doing so, we take some guidance from *Hruby and Hruby*, 304 Or 500, 748 P2d 57 (1987), which governed custody disputes between biological parents and qualifying nonparents before *Sleeper* and established a standard not unlike the one we have adopted in response to *Troxel*. In *Hruby*, after a thorough review of Oregon custody cases involving parents and nonparents, the court concluded:

" '[A] natural parent has the right to the custody of his or her children, absent a compelling reason for placing the children in the custody of another; the "best interests of the child" standard applicable to custody disputes between natural parents in a marriage dissolution proceeding is not applicable to custody disputes between natural parents and other persons.'

"*Hruby*, 304 Or at 510. The court noted expressly that *nonparents could establish compelling reasons to obtain custody without proving that the parent was unfit*. Rather, the proper inquiry was whether custody with the parent would be ' *"highly detrimental"* to the child's welfare*, regardless of

the parent's fitness,' *id.* at 508; whether custody with the nonparent was necessary 'to protect the children from some *compelling threat* to their present or future well-being,' *id.* at 509; and whether there was 'good cause' or 'cogent' reasons, to place the child with the nonparent, *id.* at 510. Summarizing, the court explained:

> " 'We use "compelling" to emphasize that in a custody dispute between a natural parent and some other person, a court should not be concerned with attempting to maximize a child's welfare, but with determining whether the child will receive adequate care and love from its natural parent and whether the child will be otherwise unduly harmed, physically or psychologically, by giving custody to the natural parent.'

"*Id.* at 511. Applying that standard, the court concluded that the child's aunt had not presented sufficiently compelling reasons to acquire custody:

> " 'The child has an emotional attachment to the father and wishes to be with him (though also with the aunt). In addition, the child stayed at the father's home in San Diego for six weeks without experiencing any apparent psychological or emotional difficulties. Given these facts * * *, we conclude that there is no compelling reason to deny custody to the father. There has been no showing that the child would not receive adequate care and love from the father or that the child would be otherwise unduly harmed, physically or psychologically, by giving custody to him.'

"*Id.* at 517-18. *See also Fenimore v. Smith,* 145 Or App 501, 509-11, 930 P2d 892 (1996), *rev den,* 326 Or 389 (1998) (applying *Hruby;* stepfather of adolescent daughter who has suffered 'traumatic loss' overcame parental presumption because removing her from stepfather's house would cause 'undue psychological harm' despite natural parent's fitness); *Cerda and Cerda,* 136 Or App 104, 109, 901 P2d 263 (1995), *rev den,* 322 Or 598 (1996) (applying *Hruby;* father's uncontrolled anger and abusive behavior constitute compelling reasons to place children with grandparents))."

(Third set of brackets and omission in original; footnote omitted; emphasis added.)

     *Wilson, O'Donnell-Lamont,* and *Wooden* establish that, although a *fit* parent is entitled to a presumption that

he or she will act in the best interest of his or her child, a non-parent may rebut that presumption. To rebut the presumption, the nonparent does not need to demonstrate that the parent is unfit. Instead, the nonparent may rebut the presumption by proving by a preponderance of the evidence that compelling circumstances exist such that it would be detrimental to the child if the parent were to obtain custody. In other words, the nonparent must demonstrate that the parent will not provide adequate love and care or that the child will face an undue risk of physical or psychological harm in the parent's custody. With those principles in mind, I turn to the facts of this case.

In my opinion, applying the above standard to the facts of this case, grandmother has presented sufficient evidence and has overcome the presumption in favor of father. I agree with the majority that, at the time of trial, father was a *fit* parent and is entitled to the presumption. As discussed above, however, the fact that he is presently a fit parent is not the end of the inquiry. We must also decide whether grandmother has overcome the presumption that father will act in the best interests of the children. Contrary to the majority's assertion, I do not compare father's home with grandmother's home. Instead, I focus on whether grandmother has demonstrated by a preponderance of the evidence that father cannot or will not provide adequate care and love or that giving custody to him will cause the children to face an undue risk of physical or psychological harm.

Before discussing the details of the evidence that establish that father cannot or will not provide adequate care and love or that the children face an undue risk of physical or psychological harm, I address a fundamental disagreement that I have regarding the majority's assessment of the evidence. In concluding that grandmother's evidence is insufficient to overcome the presumption in father's favor, the majority focuses primarily on father's performance as a parent during the 10-month period of the children's lives when father cared for them. The majority acknowledges and discusses some of father's difficulties and his complete inadequacy as a parent before August 1999, when the children began living with him.[2] However, it then goes on to hold, in a

---

[2] The majority states that "[i]t is of some significance that[, in August 1999,] the trial judge in this case, acting as a juvenile court judge, returned the children

conclusory fashion, that father's display of adequate parenting during the 10-month period that he cared for the children before the June 2000 hearing overcomes or essentially trumps his past inadequacies. The majority's holding is problematic because it is based on an expert's report and testimony that are not highly persuasive and it focuses almost exclusively on father's behavior during the 10-month period before the hearing.

In concluding that father's past deficiencies as a parent have been overcome, the majority relies heavily on the testimony of and an evaluation prepared by Joseph Mazza. Before the custody hearing, the parties stipulated that Dr. Catherine Bolstad should perform a custody evaluation. Apparently, father hired Mazza to perform another evaluation after Bolstad issued her custody study in which she recommended that grandmother should be given custody. Mazza concluded that, at the time of his evaluation, father was successfully parenting the children. There are a number of factors, however, that limit the persuasiveness of Mazza's evaluation. First, in conducting his evaluation, Mazza talked primarily to individuals to whom father directed him to talk. Consequently, most of the information that Mazza obtained regarding father's behaviors before the move to Roseburg was obtained from father, Chism, and one sister whom father told Mazza to interview. Although Mazza did review Bolstad's written report, he did not talk to grandmother or any of the other family members who had been extensively involved in father's life or the children's lives before the 10 months that they lived in Roseburg. Consequently, Mazza's evaluation of that 10-month period was made with little first-hand knowledge of the context of father's overall behavior as a parent.

Second, as the trial court noted, Mazza's conclusion that father has fundamentally changed his behavior is less than compelling. Mazza explained that his conclusion was based, in part, on the premise that, from 28 to 32 years of age, young adults may make fundamental changes in their lives.

___

to father rather than placing them with grandmother." 185 Or App at 529. The trial judge, however, specifically noted, in making the decision in this case, that the juvenile case involved a different standard of proof.

Further, Mazza himself did not appear to be strongly convinced that father's change would last. In assessing whether that change would last, Mazza explained:

"I see this as somewhat of a belated emancipation of sorts. Whether it will stick or not, I don't know. I think he has made a fundamental change. *Our best predictor for future behavior is past behavior.* And we have a track record of some adolescent type past behavior and then we have nine months where we've seen some responsible behavior."

(Emphasis added.) Whether there is a risk that father will return to his past behavior is a critical issue in this case. It is imperative in making such a determination that the most accurate and complete information be obtained. That information should include some contact with the many family members and other persons who have first-hand knowledge about father's past behavior. That critical determination should not be based primarily on 18 hours of observation, only part of which included observation of the children. Further, the persuasiveness of that evidence is diminished by the fact that the observations were made in father's home during a time that father knew that his parenting skills were being evaluated.

The trial court also did not find Mazza's report highly persuasive. The court explained that Mazza's

"report was really not very helpful to this [c]ourt because it was a one-sided report in that he only contacted the people that were favorable to [father]. * * * Mazza was unable to tell the [c]ourt if the alleged improvement in [father's] behavior with the children would last."

In contrast, the court found Bolstad's report to be far more helpful:

"Dr. Bolstad, a licensed psychologist, and acknowledged by [father's] expert as a respected expert in her field, performed a custody evaluation pursuant to stipulations to the party. Dr. Bolstad strongly recommends that custody of the children be awarded to [grandmother]. She testified it would be more harmful to the children to leave them with [father] than return them to [grandmother].

"Dr. Bolstad—and these are findings I'm making by this—Dr. Bolstad based her opinion on careful considerations of the evidence that she had gathered. Her evidence included contact with both of the parties and their household members[,] observing parent-child interaction, contact with references, psychological testing and review, [and] the written materials submitted by the parties.

"I adopt Dr. Bolstad's report into my findings of fact. Not only [are] her findings complete in themselves but the witnesses that I heard support her findings. And I find her conclusions not only credible, but compelling as well."[3]

Moreover, the majority's holding depends in large part on the proposition that father's reasonably successful performance during the 10-month period that he had the children in Roseburg is almost conclusive evidence that he has changed and has overcome his past deficiencies:

"Here, each concern is ameliorated by the fact that father exercised his parenting responsibilities in exemplary fashion for the 10 months that he had custody. That performance tends to render our concerns about the future speculative. Because of the speculative nature of those concerns, we conclude that we cannot give efficacy to the * * * presumption and at the same time award grandmother custody on this record."

185 Or App at 535. In other words, the majority reasons that the presumption is not overcome here because father's good performance for the 10-month period prior to trial "render[s] our concerns about the future speculative." 185 Or App at 535. I do not understand why that is so.

Certainly a parent's performance during the time period immediately before a custody hearing must be given significant consideration. However, I do not agree that the fact that a person has been an effective parent for a short

---

[3] Bolstad's evaluation of the parties was a custody evaluation in which ultimately she made a determination of what was in the best interest of the children. That, of course, is not the applicable standard here. The majority asserts that use of the best interest standard renders Bolstad's evaluation of the parties essentially meaningless. I strongly disagree. Bolstad's thorough observations regarding the children, father, and grandmother and her findings regarding their strengths, weaknesses, needs, and limitations are still quite pertinent to our assessment of whether grandmother has overcome the presumption that father, as a fit parent, will act in the best interests of his children.

period of time before a custody hearing *necessarily* means that that behavior completely ameliorates prior periods of inadequacy as a parent. We are obligated to determine whether father *will provide* adequate love and care and whether the children *will face* an undue risk of physical or psychological harm. In other words, we are obligated to make a determination about father's future performance as a parent and the future risks that the children will face in his custody. That determination must include not only father's most recent performance as a parent but also father's long-term history as a parent. That is particularly so where the parent's past behavior includes conduct that would unquestionably pose a serious risk to his or her children, as is the case here.

With that in mind, I turn to the evidence in this case. Although the evidence indicates that father engaged in some positive parenting behaviors during the 10-month period that the children lived with him in Roseburg, grandmother presented additional evidence concerning father's parenting before and during the 10-month period. Specifically, the evidence bearing on whether the presumption has been overcome concerns (1) father's past inadequate parenting, (2) the particular psychological vulnerabilities of these children, (3) father's anger management issues, (4) father's manipulation of the children and disruption of their relationship with grandmother, and (5) the role of substance abuse in father's life.

The first area of concern is father's complete inadequacy as a parent before the 10-month period in Roseburg. As discussed above, in deciding whether the presumption has been overcome, we must evaluate father's entire history as a parent. As Mazza stated in assessing father's chances of maintaining the apparent changes in his life,

> "I see this as somewhat of a belated emancipation of sorts. Whether it will stick or not, I don't know. I think he has made a fundamental change. Our best predictor for future behavior is past behavior. And we have a track record of some adolescent type past behavior and then we have nine months where we've seen some responsible behavior."

Bolstad also expressed the view that a person's past behavior is a very valid predictor of future behavior.

There are a number of areas of very serious concern regarding father's past behavior. This is not a case of a parent who has merely had some deficiencies in his or her parenting skills over the years. There is really no dispute that father's parenting before the 10-month period in Roseburg was completely inadequate. The children were 10, 8, and 6 at the time of trial in June 2000. During much of the period from 1990 to 1999, father's behavior as a parent amounted to neglect. Early in these children's lives, father essentially abandoned them to their mother, his ex-wife. According to the record in this case, mother was involved in drugs and neglected the children in numerous ways, including exposing at least one of the children to sexual activities. During that time period, father was working at a bar in Portland and engaging in prostitution in exchange for money and drugs. One of father's sisters testified that father had told her that he was aware of mother's drug activities. There is no evidence that father made any effort to care for or protect the children during that five-year time period. As the trial court found, father was simply not part of the children's lives during the time that they were with mother. Father eventually obtained legal custody of the children. The evidence indicates that he immediately turned over responsibility for the children to grandmother who, with the assistance of other family members, provided financial, physical, and emotional care for the children, who at that time were physically and emotionally distressed.

Father lived with grandmother and the children during most of the time from 1995 until early 1999 when he moved to Roseburg to be with his domestic partner. During that time, despite living in the same home and being unemployed most of the time, father provided little or no financial support and minimal care for the children. He apparently had occasional computer jobs, some for grandmother. He often stayed up all night on the computer and slept during the day. His involvement with the children during that time was minimal. He had almost no involvement with the children's schools. The evidence simply does not support the

majority's assertion that father's involvement with his children during that time period was "significant." 185 Or App at 533. Moreover, the majority's assertion that father's involvement was significant conflicts with its determination that, during that time period, "his role as a parent was clearly inadequate." 185 Or App at 533.

The second area of concern in this case is the psychological vulnerabilities of the children. In evaluating whether the children face an undue risk of psychological harm, it is important to understand their background. Of particular concern is the effect of their experiences before grandmother assumed their care in the fall of 1994. In Bolstad's custody evaluation, she concluded, after talking to all of the affected parties, that, because of the children's early life experiences, they were "significantly at risk children." She testified:

"Q  After meeting with them and the other interviewing you did in this case how important do you feel that it is for the children's home to be stable?

"A  Very.

"Q  And why is that?

"A  Because I think these little girls are children who are at risk because of their history.

"Q  And can you tell us why you think they are at risk?

"A  What I understand about their history is obtained from both [father] and [grandmother]. And that basically was that for the first—until 1995—so it was until the girls were varying ages. I think [H] was under a a year and [B] was just about five. They lived in an extraordinarily upset, unstable, unpredictable environment.

"Both [father] and [grandmother] told me that [the children's] mother was a drug user. Both of them told me that their mother had engaged in sexual relations in front of at least [B] and they thought perhaps in front of [E]. Both of them indicated to me that [B] had been involved in some of the sexual behavior with the adults. Both of them said that the girls had been neglected, unfed, dirty. Both of them told me that the little girls had basically been taking care of themselves, i.e., [B] took care of the two younger ones.

"And with the drug use, the exposure to adult sexuality, the erratic nurturance, you have children at significant risk for development of later pathology. Those are risk factors that are recognized in our field.

"There is a man in London called Michael Rudder who is an expert on this. And those fulfill three of the main five risk factors that he speaks about in terms of prediction of later difficulty for children. I take them very seriously."

In her report, Bolstad also stated:

"[A]ccording to numerous sources, their early years were spent with a parent whose drug use and alternative lifestyle ensured that there would be a paucity of nurturance and care given to them. There were indications from [one of the children] that she had been sexually molested while in her mother's care. During these early years, their father was only sporadically present; what consistency and predictability could be found in their young lives was provided by their grandmother and several of their aunts and an uncle. Lest it be thought that all traces of these earlier difficulties have been removed, an incident of sexualized play among all three girls and their cousin occurred prior to [father's] move to Roseburg."

It is clear that continuing stability is critical in the children's lives. Unquestionably, grandmother has played a significant role in establishing such stability. As Bolstad testified, grandmother and other family members in Bend have been the only source of stability in the children's lives. It is apparent that the children have a strong bond with grandmother and those other family members. As both Bolstad and Mazza apparently concluded, it would be harmful to the children if those important relationships are not maintained. The trial court agreed:

"Whether we do this by a preponderance, substantial and compelling, or beyond a reasonable doubt, there is not any doubt in my mind that [grandmother] is a psychological parent in this case.

"And I further find, based on the fact of what she has done with these children, it would be harmful to the children if she were not to continue the relationship with these children. It would be harmful.

"Again, let me repeat this. It would be harmful to the children if she were not to continue her relationship with the children."

The trial court also found that the evidence demonstrates that grandmother would work to continue the relationship between father and the children but that father would not work to continue the relationship between grandmother and the children. The trial court stated that, "when we look at who is going to foster the relationship with the other parent, it is absolutely overwhelming [grandmother] is going to do it and that [father] is not." Father admits that he told the children that their grandmother was "the enemy" and that he might have told them that she stole them from him and that he could not love her or be friends with her. The evidence demonstrates clearly that the children are in particular need of stability and that, if the children are removed from grandmother's custody, they will face an undue risk of psychological harm.

The third area of concern is father's problems with anger. The evidence establishes that, during the time that he lived with grandmother, father had serious difficulties with anger. He was at times verbally abusive to the children, calling them "little fucking cunts" and "fucking bitch[es]." There is also evidence that he threatened to burn grandmother's home down and threatened a number of times to kill all of the family members. Father's brother, a physician who lives in California, testified that father had asked for his support in obtaining custody of his children but that he had refused to assist father because of father's verbal abuse of the children. He described father's behavior as "[v]ery erratic, quite a bit of emotional lability. He seemed out of control, as if he was distressed about something. There were a lot of—there were temper tantrums." The brother described father's living situation at grandmother's as a "reign of terror." He also testified that father's behavior towards his children was "very disturbing," and that father "referred to them frequently as 'cunts' and was quite dismissive. Openly talked very negatively and in hurtful ways about them." As the trial court found, during the time that he lived at grandmother's house, father's "angry behavior was such that all family members were required to walk on eggshells around him." There was

testimony from numerous family members, including father's brother and sisters, that father has had a continuing and serious problem with anger management. Bolstad testified that she believed that father's verbal abuse of his children has had a harmful and long-lasting effect on the children. Father testified that he has realized the error of his ways, but there is little in the record, aside from father's own testimony, that reveals whether this long-term problem, which poses a serious risk of psychological harm to his children, has been overcome.

The fourth area of concern is father's apparent manipulation of the children to achieve his goal of obtaining custody. A very telling piece of evidence in this case is a transcript of a tape recording of a conversation between father and his children.[4] The conversation occurred in July 1999 during the time that grandmother had regained custody of the children. In it, father discussed with the three young children the court proceedings regarding their custody, and at least some of the discussion seems quite inappropriate. For example, in the conversation, he tells the children that one of the judges who has been involved in the case has been unfair and that she is dragging her feet in getting off the case. He also talked to the children about matters that were going to come up at the hearing, such as his abusive language toward them. During the conversation, father also discouraged one of the children from seeking counseling and he characterized grandmother as the "enemy."[5] The trial court was also disturbed by father's manipulative behavior. It stated:

---

[4] The majority reasons that, "[b]ecause the tape was a year old at the time of trial, involved a different hearing, and came before the time period that father had custody, we do not give it the weight that the trial court did or the dissent does" and that "[w]hat we find more persuasive is the uncontradicted evidence of father's healthy and extensive involvement with the children in the 10 months preceding the trial in this case." 185 Or App at 530 n 4. Even though the tape involved an earlier hearing, it provides insight into father's judgment and his apparent willingness to pressure the children to achieve his goals. The fact that father demonstrated greater involvement with the children during the 10 months before trial is unrelated to father's apparent manipulation of the children to obtain custody and does not negate the weight of that evidence.

[5] The majority states that

"[w]itnesses who had no interest in the outcome of the case (their teachers and school counselor) uniformly stated that the children were doing well and that they demonstrated no indicators of needing counseling; thus, neither the

"I spent a great amount of time of going over the transcript of the phone call. That was on 7-1-99. And quite frankly, I was dismayed when I saw what kind of pressures were being placed on these children, and I so find. And based on that and what I've heard, I disregard what the children are telling me. I think they have been subjected to pressure. And quite frankly, some of the comments they—[one of the children] made, were not the comments of children. They were the—as far as I'm concerned, the words of an adult. And—a perfect house, things of that nature."

The described evidence is disturbing not only because the nature of father's discussion of the court proceedings is inappropriate and particularly harmful to the children but also because it demonstrates father's objective of obtaining custody of the children at all costs, including disrupting the children's attachment to grandmother and other family members. The trial court found that father "has done nothing but undermine the relationship that [grandmother] has with her granddaughters."

---

negative effects that they may have experienced with their mother nor any negative effects from their removal from grandmother's custody are apparent from their current behavior. Indeed, as the school counselor pointed out, it is often better for children to move on with their lives than to focus on things that happened previously."

185 Or App at 536.

First, to the extent that the majority implies that the children were not performing well in Bend, the evidence does not support that implication. It is also interesting to note that one of the teachers was under the impression that, when the children lived in Bend, father provided the parenting with assistance from grandmother.

Second, the record indicates that the teachers had training in spotting child abuse and neglect but does not indicate that they had training in determining whether the children would benefit from counseling. With regard to B's school counselor, she testified that she taught in B's classroom, she had lunch in her office "for fun" with a group including B, and she met with B "a couple of times." One interaction concerned a friendship problem. The second interaction concerned this court case. Specifically, the counselor testified, in part:

"You know, sometimes we make assumptions that things have gone on in kids' past or things are going on right now in their lives that perhaps they need counseling. Well, my job is really—is to check in. And I was available for her and I checked in with her about the court case. She said I'm okay, you know, I'm fine. And I said, well, I'll just check in with you once in [a while] and see how you are doing. And so that is what I did. And she didn't require counseling, ongoing counseling with me. And when I checked in with her she would give the thumbs up, you know."

The counselor's testimony indicates that her opinion is based on "checking in" with B once in a while and relying on B's self-report about her needs.

The final area of serious concern is the role that substance abuse has played in father's life. Father has a long history of drug and alcohol use. Father was involved with drugs and alcohol during the time that mother was caring for the children. There was also evidence that he used drugs during the time that he lived with grandmother and his children. In fact, grandmother testified that, as late as 1999, she found father in the house with a transient and suspected that they had been doing drugs. Grandmother testified that, when that happened, she took the children to a hotel so that they would not be exposed to such circumstances. Of particular concern is father's minimization and attempted deception regarding that problem. He, in fact, told the court that he had not used drugs since his marriage in 1989. The trial court rejected his testimony:

> "[Father's] testimony that he has not used controlled substance[s] since his marriage in '89 is not credible. [Grandmother's] witnesses—based on [father's] admissions or on personal observations—testified he had used drugs since May of '89 up until May of '99. And certainly I find that he did use those."

I agree with the trial court's assessment of father's credibility on that issue.

Additionally, of very serious concern is the continuing role of alcohol in father's life during the 10-month period before the hearing. In Roseburg, father and the children were living in the home of his domestic partner, Chism, who, by all accounts, including his own admission, has a serious alcohol problem. Of particular significance here is that father often used Chism as his daycare provider. Apparently, during the time that Chism was providing daycare, the youngest of father's children found Chism on the floor, talking incoherently and bleeding. Apparently, she was home alone with Chism at the time. In addition, not too long before trial, Chism went on an alcoholic binge and left the home for three or four weeks to attend a treatment program.[6] Those circumstances raise serious questions about father's willingness

---

[6] The majority is correct that we read the record differently. My understanding is that there were two separate incidents. My concern, however, is the role that substance abuse has played in father's life over a long period of time. For example, despite father's knowledge of Chism's problems with alcohol, father generally

and ability to provide a safe environment for his children that does not create an undue risk of physical or psychological harm to the children.

In sum, the record here demonstrates by a preponderance of the evidence that grandmother has overcome the presumption that father will act in the best interests of the children. The evidence shows that, during the time period from the birth of the children until 1999, father did not provide adequate care and love and engaged in behavior that caused the children to face undue risks of physical and psychological harm. Father's parenting certainly did improve during the time he had the children in Roseburg. Nevertheless, in view of all of the factors discussed above, including the children's particular need for stability, the uncertainty of the permanence of father's dramatic change from his very serious and long-term behaviors, and the role that substance abuse has played in father's life, I conclude that giving father custody would cause the children to face an undue risk of psychological harm. Accordingly, I would hold that grandmother has overcome the presumption that father, as a fit parent, will act in the best interest of his children.[7] After having had the opportunity to assess the credibility of the witnesses, the trial court, in a thoughtful and articulate opinion, awarded custody to grandmother. I agree with the trial court's decision. For all of the above reasons, I respectfully dissent.

Haselton, Linder, and Brewer, JJ., join in this dissent.

---

continued to use him as a daycare provider throughout their relationship. Thus, I view Chism's admitted alcoholism in that context.

[7] In the final analysis, according to the majority, this is a close case, and, for that reason, "it must be the presumption that becomes the determining factor." 185 Or App at 538 n 10. I agree that the presumption must be given significant weight in determining whether a nonparent has met his or her burden to overcome it. However, the presumption is not an instrument for deciding a "close" case. It is not an instrument that allows us to abdicate our responsibility to evaluate all of the evidence to determine whether a nonparent has overcome the presumption by a preponderance of the evidence. In accordance with that understanding, with recognition that people change, and after examining all of the evidence in this case, I would hold that grandmother has overcome the presumption by a preponderance of the evidence.